**Ruben GONZALEZ, Reinaldo Palermo, Sammy Rivera and Latino Officers Association, Plaintiffs,**

v.

**CITY OF NEW YORK, New York City Police Department, Howard Safir, Commissioner, Chief Charles Kammerdener, Captain Dillon, Captain John Gorman, and Lieutenant T. Carroll,[1] Defendants.**

**No. 00 Civ. 1822(VM).**

United States District Court, S.D. New York.

Jan. 18, 2005.

---

1. Plaintiffs do not provide the full name of defendant Lieutenant T. Carroll in the case

caption. The record indicates that his full name is John T. Carroll. Plaintiffs also omit the first name of defendant Captain Dillon in the case caption. His deposition transcript indicates that his full name is John T. Dillon.

Daniel J. McKenna, Cronin & Byczek, L.L.P., Joan M. Cresap, Cronin & Byczek, L.L.P., Lake Success, NY, for Plaintiffs.

Julie E. O'Neill, Paul A. Crotty Corporation Counsel of the City of NY, New York City, for Defendants.

## DECISION AND ORDER

MARRERO, District Judge.

Plaintiffs Ruben Gonzalez ("Gonzalez"), Reinaldo Palermo ("Palermo"), Sammy Rivera ("Rivera"), and the Latino Officers Association (the "LOA") (collectively, "Plaintiffs") bring this action against the City of New York, the New York City Police Department (the "NYPD"), and their former or current supervisors in the NYPD (collectively, "Defendants") alleging employment discrimination on the basis of Plaintiffs' national origin and race and in retaliation for Plaintiffs' opposition to Defendants' alleged discriminatory practices. Plaintiffs assert claims under: Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), provisions of other federal civil rights statutes, specifically 42 U.S.C. §§ 1981, 1983 and 1985, and the corresponding New York State and City Human Rights Laws ("HRL").

Defendants have moved for summary judgment with respect to the following claims: Palermo's and Rivera's claims that Defendants discriminated against them on the basis of race and national origin by failing to promote them; Plaintiffs' claims that they were subjected to retaliation for engaging in protected activities under Title VII; and Plaintiffs' claims that Defendants engaged in a pattern and practice of discrimination against Hispanic detectives.[2]

---

2. Defendants move for summary judgment on all of the claims of Palermo and Rivera. They explicitly argue, however, only that these claims fail under the standard applicable to Title VII claims. Nevertheless, because the same standard applies to Plaintiffs' claims under city and state law and under 42 U.S.C. § 1983, *see Torres v. Pisano,* 116 F.3d 625, 629 n. 1 (2d Cir.1997) ("[w]e have frequently noted that claims brought under New York State's Human Rights Law are analytically identical to claims brought under Title VII.") (citations omitted); *Batka v. Prime Charter, Ltd.* 301 F.Supp.2d 308, 312 n. 4 (S.D.N.Y. 2004) ("Claims of employment discrimination brought under the [the New York State Human Rights Law, New York Exec. Law § 296 *et seq.,* and the New York City Human Rights Law, N.Y.C. Admin. Code § 8–107 *et seq.,*] are analyzed under the same *McDonnell Douglas* framework as Title VII claims.") (citing *Weinstock v. Columbia Univ.,* 224 F.3d 33, 42 n. 1 (2d Cir.2000)); *Feingold v. New York,* 366 F.3d 138, 159 (2d Cir.2004) ("Once action under color of state law is established, [the plaintiff's] equal protection claim [brought under 42 U.S.C. § 1983] parallels

In addition, Defendants move to dismiss all of the LOA's claims for failure to prosecute under Federal Rule of Civil Procedure 41(b) ("Rule 41(b)"). For the reasons explained below, the Court grants in part Defendants' motion for summary judgment and denies Defendants' Rule 41(b) motion to dismiss.

## I.  BACKGROUND

The three individual plaintiffs in this case, Gonzalez, Palermo and Rivera, who are Hispanic, are retired detectives with the NYPD.[3] Each was employed by the NYPD for close to or more than twenty years.[4] Although each of the individual plaintiffs was promoted from the rank of Police Officer to that of Detective Third Grade,[5] they all argue that Defendants' failure to promote them to Detectives Second Grade on a timely basis[6] was the

---

his Title VII claim. The elements of one are generally the same as the elements of the other and the two must stand or fall together.") (citations omitted), the Court's evaluation of Defendants' arguments relating to Title VII standards applies equally to Plaintiffs' § 1983 and State and City HRL claims. Although claims under 42 U.S.C. § 1981 (" § 1981") and 42 U.S.C. § 1985 (" § 1985") involve different elements than those involved in Title VII claims, they share in common with Title VII claims the essential element of intentional unlawful discrimination. *See Mian v. Donaldson, Lufkin & Jenrette Securities Corp.*, 7 F.3d 1085, 1087 (2d Cir.1993) (stating that, to establish a claim under § 1981, a plaintiff must allege facts in support of, inter alia, "an intent to discriminate on the basis of race by the defendant" and that, in order to establish an unlawful conspiracy claim under § 1985, a plaintiff must demonstrate "some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action.") (internal quotation marks and citations omitted). Therefore, the Court's determination that certain of Plaintiffs' Title VII claims do not survive summary judgment due to the inadequacy of evidence regarding discriminatory intent also results in dismissal of Plaintiffs' § 1981 and § 1985 claims. Because "proof of a prima facie case [of a Title VII violation] ... raises an inference of discrimination," *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 526, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), as discussed in greater detail below, Plaintiffs' failure to establish a prima facie case with respect to their Title VII claims implies a failure to establish the element of discriminatory intent with respect to their claims under § 1981 and § 1985 as well.

3.  The following factual summary derives primarily from the following documents: Complaint, dated Mar. 9, 2000; Defendants' Mem-

orandum of Law in Support of Motion for Partial Summary Judgment, dated Sept. 15, 2003 ("Defs.' Mem."); Declaration of Phyllis Calistro in Support of Defendants' Motion to Dismiss with accompanying Exhibits and Affidavits, dated Sept. 15, 2003 ("Calistro Decl."); Defendants' Local Rule 56.1 Statement of Undisputed Facts, dated Sept. 15, 2003; Plaintiff's [sic] Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment with accompanying Exhibits and Affidavits, dated May 26, 2004 ("Pls.' Mem."); Plaintiff's [sic] Local Civil Rule 56.1 Statement of Undisputed Facts, dated May 27, 2004; and Declaration of Susan P. Bernstein in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment with accompanying Exhibits and Affidavits, dated May 27, 2004 ("Bernstein Decl."). Except where specifically referenced, no further citation to these sources will be made.

4.  Gonzalez was appointed to the NYPD in 1982 and retired in 2001. Palermo was appointed on June 25, 1973 and retired in 1997. Rivera was appointed in 1981 and retired in 2001.

5.  Neither Plaintiffs nor Defendants explain the ranking system within the NYPD as it relates to this case. It appears from the record that Detective Third Grade is the lowest rank of detectives and that Detective First Grade is the highest.

6.  Plaintiffs argue that they should have been promoted to Detectives Second Grade in the early 1990s. Gonzalez and Rivera were promoted to Detectives Second Grade in 2000 and 2001, respectively, after the filing of the present lawsuit.

result of discrimination against them as Hispanics.

In support of their claim, Palermo and Rivera [7] state that white officers with less seniority and who had received fewer recommendations for promotion than Palermo and Rivera were nonetheless promoted to Detective Second Grade ahead of them. Both of these plaintiffs have submitted extensive records documenting their achievements as officers and detectives, including performance evaluations, commendations, and recommendations. Palermo received overall performance evaluation ratings of "meets standards" in 1974, 1976 and 1977, "above standards" in 1975, "highly competent" in 1991, and "exceeds standards" from 1992 through 1995.[8] (Ex. I to Bernstein Decl.) Rivera received overall performance evaluation ratings of "meets standards" in 1981 and 1982 and "exceeds standards" in 1996.

Defendants explain that, in order to be placed in the pool of candidates for promotion, a detective must be recommended for promotion by his or her local commanding officer.[9] Palermo was promoted to Detective Third Grade in 1982. He was subsequently recommended for advancement in grade status in 1984 and 1986 through 1988. (See Ex. I to Bernstein Decl.) Nonetheless, he was never promoted to Detective Second Grade. Rivera was promoted to Detective Third Grade in 1987. He was recommended for promotion from Third to Second Grade Detective once in 1991 and twice in 1993.[10] He was not promoted to Detective Second Grade until 2001, though, after the filing of the instant lawsuit.

Based on their claim that Defendants failed to promote them due to racial discrimination, as well as alleging other claims of discrimination discussed below, Plaintiffs filed complaints with the Equal Employment Opportunity Commission (the "EEOC") in the mid- and late 1990s. The EEOC determined that it was more likely than not that Defendants had violated Title VII with respect to Rivera and Palermo.[11] After exhausting their administrative remedies before the EEOC, Plaintiffs filed the present lawsuit on March 9, 2000.[12]

---

7. Gonzalez's claim of failure to promote is not discussed here because Defendants have not moved for summary judgment with respect to his claim.

8. Performance evaluations for the remaining years are either not included in the record or do not provide overall evaluations, but instead comment on specific performance areas.

9. Defendants further assert that there is a four-step selection process for promotions: first, commanding officers compile lists of Third Grade Detectives whom they consider to be deserving of promotion; those lists are provided to the Borough Commanders; second, the Borough Commanders create their own lists based on those provided by the commanding officers and submit them to the First Deputy Commissioner; third, the First Deputy Commissioner integrates and ranks the names on each Borough Commander's list in order of recommendation and provides the resulting information to the Police Commissioner; fourth, the Police Commissioner exer-

cises his discretion to select individuals from the First Deputy Commissioner's list for promotion. (See Defs.' Mem. at 3.)

10. Rivera's evaluators recommended that he remain in his current assignment for the years 1981, 1982, 1988 and 1989.

11. The EEOC's findings are not entitled to any deference, but the Court may give them some consideration in arriving at its own determinations. See Gourdine v. Cabrini Medical Center, 307 F.Supp.2d 587, 598 (S.D.N.Y. 2004).

12. The receipt of a "right to sue" letter from the EEOC is a prerequisite to filing a Title VII action in federal court. See 42 U.S.C.2000e–5(f)(1) ("If a charge filed with the Commission ... is dismissed by the Commission, or if within one hundred and eighty days from the filing of such charge ... the Commission has not filed a civil action under this section ..., or the Commission has not entered into a

## II. DISCUSSION

### A. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) authorizes the granting of summary judgment when the evidence "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is genuine where "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.*

The party moving for summary judgment bears the initial burden of showing the absence of a genuine dispute over any issues of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). After such a showing, the burden shifts to the non-moving party to provide evidence of "specific facts showing that there is a genuine issue for trial." At this stage, the non-moving party may not rest on "mere allegations or denials," Fed.R.Civ.P. 56(e), of the movant's claims or "on mere conclusory allegations or speculation, but instead must offer some hard evidence showing that its version of the events is not wholly

fanciful." *D'Amico v. City of New York,* 132 F.3d 145, 149 (2d Cir.1998).

In considering a motion for summary judgment, the Court must " 'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.' " *Williams v. R.H. Donnelley, Corp.,* 368 F.3d 123, 126 (2d Cir.2004) (quoting *Dallas Aerospace, Inc. v. CIS Air Corp.,* 352 F.3d 775, 780 (2d Cir.2003)).

### B. TITLE VII

Title VII makes it unlawful for employers "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C.2000e–2(a)(1). When a Title VII plaintiff cannot provide direct evidence of discrimination, courts generally use the burden-shifting approach set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–805, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to evaluate the strength of the Title VII claim.

The *McDonnell Douglas* test involves three steps. First, the plaintiff must show a prima facie case of discrimination. In order to establish a prima facie

---

conciliation agreement to which the person aggrieved is a party, the Commission ... shall so notify the person aggrieved and within ninety days after the giving of such notice a civil action may be brought against the respondent named in the charge."). The record indicates that Palermo and Gonzalez received letters from the EEOC granting them the right to sue Defendants in federal court, but that Rivera did not receive such a letter. Although Defendants do not raise this issue, the Court notes that Rivera has satisfied the criteria for obtaining a waiver of the requirement that he present a right-to-sue letter. Courts may "waive or toll ... [this] statutory requirement" if the plaintiff "show[s] or allege[s] that

he made an effort to procure the right to sue letter or that he raised the failure to issue a right to sue letter with the EEOC prior to filing ... [a federal court] action." *Dollinger v. State Ins. Fund,* 44 F.Supp.2d 467, 474 (N.D.N.Y.1999) (citations omitted). Plaintiffs allege in the Complaint that Rivera sent letters to the EEOC requesting a right-to-sue letter on October 29, 1999 and December 7, 1999, (*see* Complaint ¶ 16), and have submitted a copy of the letter dated December 7, 1999 as Exhibit H to the Complaint. In light of Plaintiffs' allegation that Rivera twice attempted to obtain a right-to-sue letter, the Court finds that his failure to produce one does not bar him from filing this lawsuit.

case of discrimination, the plaintiff must show that " '(1) she is a member of a protected class; (2) she applied and was qualified for a job for which the employer was seeking applicants; (3) she was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications.' " *Petrosino v. Bell Atlantic,* 385 F.3d 210, 226 (2d Cir.2004) (quoting *Brown v. Coach Stores, Inc.,* 163 F.3d 706, 709 (2d Cir.1998)). The plaintiff's evidentiary burden at the prima facie stage is "de minimis." *Howley v. Town of Stratford,* 217 F.3d 141, 150 (2d Cir.2000). Circumstantial evidence alone, however, is insufficient to raise a presumption of bias where a plaintiff does not directly connect such evidence to the "alleged discriminatory animus." *Rose v. New York City Bd. of Ed.,* 257 F.3d 156, 161–62 (2d Cir.2001).

Once the plaintiff has established a prima facie case, a rebuttable presumption of discrimination arises, shifting the burden back to the defendant to provide a nondiscriminatory reason for the employment decision. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Finally, if the employer provides a nondiscriminatory reason for its actions, the presumption of discrimination is rebutted and the burden shifts back to the plaintiff to show by a preponderance of the evidence that the employer's decision was motivated, at least in part, by a discriminatory reason. *See Fields v. New York State Off. of Mental Retard. & Dev. Disab.,* 115 F.3d 116, 120–121 (2d Cir.1997).

## C. *PALERMO'S AND RIVERA'S CLAIMS OF FAILURE TO PROMOTE*

In light of the legal standards for summary judgment and Title VII claims based on adverse employment actions, the first question before the Court is whether Plaintiffs have demonstrated that there is a genuine issue of material fact with respect to a prima facie case of discrimination. While courts are often hesitant to resolve discrimination claims on summary judgment because "the employer's intent is typically at issue," summary judgment is appropriate where the non-moving party's evidence is "so scant that a rational jury cannot find in its favor." *Chertkova v. Connecticut Gen. Life Ins. Co.,* 92 F.3d 81, 86–87 (2d Cir.1996) (citation omitted).

Although *"McDonnell Douglas* concerned a failure to rehire issue …, the case has been cited for identifying elements of a prima facie claim for failure to promote." *Brown,* 163 F.3d at 710 n. 1 (citing *Raskin v. Wyatt Co.,* 125 F.3d 55, 64 (2d Cir.1997)). The Second Circuit has explained that " '[t]he facts necessarily will vary in Title VII cases, and the specification … of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations.' " *Id.* at 709–710 (quoting *McDonnell Douglas,* 411 U.S. at 802 n. 13, 93 S.Ct. 1817). Applying these standards to the facts presented in the instant case, for Plaintiffs to establish a prima facie case of discrimination with respect to their failure to promote claims, they must provide sufficient evidence of the following four claims: (1) that they belong to a protected class; (2) that they sought or were eligible for promotion to positions to which the employer was seeking to promote people; (3) that they were not promoted; and (4) that the employer promoted others instead of Plaintiffs who were less qualified for the positions than Plaintiffs.

■ With respect to these claims, Plaintiffs have demonstrated, and Defendants do not contest, that the first three elements of a prima facie case of discrimination are satisfied: that, as Hispanics, Plaintiffs belong to a protected class, that they sought or were eligible for promotion

to Detectives Second Grade and that they were not promoted to Detectives Second Grade at the relevant times. The Court is not persuaded, however, that Plaintiffs produced sufficient evidence demonstrating that there is a genuine dispute regarding the fourth element: that the detectives who were promoted in their place were less qualified than Palermo and Rivera.

"In determining whether an employee is 'qualified' under ... the *McDonnell Douglas* analysis, a court must examine 'the criteria the employer has specified for the position.'" *Williams v. R.H. Donnelley Inc.*, 199 F.Supp.2d 172, 177 (S.D.N.Y. 2002) (quoting *Thornley v. Penton Publ'g, Inc.*, 104 F.3d 26, 29 (2d Cir.1997)). According to Defendants, the decision to promote a Detective Third Grade to Detective Second Grade is "entirely discretionary" in that "there is no Civil Service promotional exam or list from which candidates advance or are assigned." (Defs.' Mem. at 2.) Nevertheless, the record shows that the NYPD generally considers certain qualifications in recommending detectives for promotion.[13]

According to defendant Captain John Gorman ("Gorman"), who was Palermo's and Rivera's supervisor in the Bronx District Attorney Squad of the NYPD, the most important qualification for recom-

mendation for promotion is seniority. (*See* Gorman Tr. at 125, Ex. J to Bernstein Decl. (stating that "using the seniority criteria [*i.e.*, seniority in job, rank and office] was the dominant thing" in compiling lists of detectives to be recommended for promotion.).) Other qualifications include "[o]verall investigative ability, success in major cases, success in cases involving unknown suspects, interview skills, interrogation skills, arrest activity, keeping supervisors informed, successful prosecutions at trial, interaction with other detectives, interaction with police officers, civilian complaints," (Carroll Tr. at 51–53, Ex. R to Bernstein Decl.), interaction with civilian complainants, tenacity, language ability, (*see id.* at 53, 55, 60), and attendance. (*See* Gorman Tr. at 121, Ex. J to Bernstein Decl.; *see also* Dillon Tr. at 33–36, Ex. S to Bernstein Decl.) Palermo and Rivera do not dispute that these additional criteria applied to the selection of candidates for promotion.

Defendants argue that Palermo's and Rivera's failure-to-promote claims must be dismissed because Palermo and Rivera have conceded that they "had no knowledge[14] as to the qualifications of other Third Grade Detectives who were promoted ahead of them, except that some had less seniority." (Defs.' 56.1 Statement

---

13. The record indicates that the following qualifications for recommendation for promotion to Detective Second Grade were not based on formal NYPD directives or guidelines. (*See* Carroll Tr. at 52, Ex. R to Bernstein Decl.; Gorman Tr. at 120–121, Ex. J to Bernstein Decl.)

14. The important point with respect to whether Plaintiffs have demonstrated that there is a genuine factual dispute regarding a prima facie case of discrimination is not whether any of the individual plaintiffs had or have any knowledge of the qualifications of the detectives who were promoted ahead of them. Rather, the important issue is whether Plaintiffs have come forward with any evidence in

the record before the Court establishing the qualifications of those detectives and demonstrating that Plaintiffs were better qualified. Defendants do not assert that the record lacks evidence regarding the qualifications of those who were promoted ahead of Palermo and Rivera, instead focusing exclusively on the individual Plaintiffs' lack of knowledge of the qualifications of those who were promoted ahead of them. The Court, based on its own review of the record, as discussed below, finds insufficient evidence of the qualifications of the detectives who were promoted ahead of Palermo and Rivera to enable the individual Plaintiffs to survive summary judgment.

¶ 6.) Defendants base this contention on the procedural point that Plaintiffs failed to comply with Local Civil Rule 56.1 ("Rule 56.1"). Under Rule 56.1, a party opposing summary judgment must file a statement of material facts "as to which it is contended that there exists a genuine issue of material fact." Local Civil Rule 56.1(b). The non-moving party's statement must controvert all material facts set forth in the moving party's Rule 56.1 Statement. *See* Local Civil Rule 56.1(c).

Any properly supported factual claim in a movant's Rule 56.1 statement that is not controverted by the opposing party is deemed admitted. *See id.* A factual claim is properly supported if it is "followed by citation to evidence which would be admissible, set forth as required by Federal Rule of Civil Procedure 56(e)." Local Civil Rule 56.1(e). Federal Rule of Civil Procedure 56(e) provides that the court may allow parties to refer to depositions in support of or opposition to a motion for summary judgment. Palermo and Rivera acknowledged in their depositions that they had no knowledge of the qualifications of those detectives who were promoted ahead of them, other than that they had less seniority than Plaintiffs. Palermo stated in his deposition that "[s]eniority is not the only criteria [sic] for promotion from third grade to second grade." (Palermo Tr. at 13, Ex. H. to Calistro Decl.) In response to the question whether he knew "anything about what [the promoted detectives'] . . . job accomplishments might have been compared to [his]," he replied "[n]o." (*Id.* at 13–14.)

Similarly, Rivera, in response to the question whether he was "aware of what the qualifications were of any of the detectives who in 1993 . . . did in fact get the promotions to detective second grade," replied: "Their qualifications? No, I don't

[know what they were]." (Rivera Tr. at 65, Ex. I to Calistro Decl.) He further admitted that he did not "know how their candidacy compared to [his]." (*Id.*)

Thus, Defendants have cited proper evidence to support the claim in their Rule 56.1 Statement of Undisputed Facts that Palermo and Rivera had no knowledge regarding the qualifications of the detectives who were hired ahead of them, other than that those detectives allegedly had less seniority that Plaintiffs. Because Plaintiffs did not controvert this claim in their Rule 56.1 Statement,[15] Palermo and Rivera must be deemed to have admitted that they had no knowledge of the promoted detectives' non-seniority-based qualifications.

Moreover, Palermo and Rivera not only admitted having no knowledge of the relevant qualifications of the detectives who were promoted ahead of them, they have failed to present any other evidence on the record regarding the qualifications, other than the seniority, of those detectives. Although Plaintiffs claim in their Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment that Defendants' own testimony demonstrates that Palermo and Rivera were better qualified than the detectives who were promoted ahead of them, the evidence they cite in support of this claim is insufficient. (*See* Pls.' Mem. at 16 (referring to "defendants [sic] own testimony as to the superior qualifications of plaintiffs").) Plaintiffs cite to performance evaluations and commendations of Palermo and Rivera, Rivera's affidavit, and recommendations for Rivera's promotion to demonstrate that the promoted detectives were not better qualified than Palermo and Rivera. Although some of the performance evaluations and commendations offer general comparisons of

---

**15.** Plaintiffs in fact did not comply at all with the requirements of Rule 56.1, as they failed to controvert any of the statements that Defendants made in their Rule 56.1 Statement.

Palermo's and Rivera's performance with that of other detectives, (*see, e.g.,* Performance Evaluation of Reinaldo Palermo, dated January 15, 1988 (stating that Palermo "compares well with his peers."), Ex. I to Bernstein Decl.), they do not provide any specific basis for comparison of Palermo or Rivera from which a rational trier of fact could reasonably conclude that any of the detectives who were promoted ahead of Palermo and Rivera were actually less qualified. If that crucial allegation were true, it is not factually supported on this record by any hard evidence or reasonable inference to which Plaintiffs cite.

Rivera's affidavit likewise fails to allege that Rivera or Palermo possessed qualifications comparable or superior to those of the officers who were promoted ahead of them. Although he states that some white officers who were promoted ahead of him had less tenure than he did, he does not specify whether or not those officers otherwise had lesser qualifications in areas relevant to advancement decisions. (*See* Rivera Aff. ¶ 24, Ex. M to Bernstein Decl. ("Michael O'Brien, white, was promoted to first grade and he had a lot less tenure than I had.").)

Had Plaintiffs provided more specific admissible evidence regarding the disparities between their seniority and that of the detectives who were promoted ahead of them, arguably it might be possible, reading the record in the light most favorable to Plaintiffs, to conclude that non-seniority-based qualifications are irrelevant because the discrepancies in seniority are so great. For example, if Plaintiffs had alleged and sufficiently demonstrated that an officer who had become a detective in 1994 was promoted to Detective Second Grade in 1995, at which point Palermo had been a detective for thirteen years, a reasonable inference may be drawn that non-seniority-based qualifications could not possibly have rendered the promoted detective more qualified than Palermo overall.[16] Given Defendants' admission that seniority is the most important criterion for selecting detectives for promotion, it would be plausible to argue that such a great discrepancy in seniority could not have been outweighed by any level of superiority with respect to other qualifications for promotion.

Plaintiffs' allegations with respect to how much more senior Palermo and Rivera were to the detectives who were promoted ahead of them, however, are too vague and conclusory to support such an inference. (*See, e.g.,* Palermo Aff. ¶¶ 11–12, Ex. H to Bernstein Decl. ("In the early 90's I was seeing officers get promoted with less time on the job than I had. . . . Most of the officers promoted were white.").) Plaintiffs provide the full names of only two detectives whom they explicitly allege were white, less senior than Palermo and Rivera, and promoted ahead of them: Roy Casse (*see* Palermo Aff. ¶¶ 17, 45, Ex. H to Bernstein Decl.) and Michael O'Brien (*see* Rivera Aff. ¶ 24, Ex. M to Bernstein Decl.). In neither case do Plaintiffs specify how much more senior they were to these detectives, nor do they offer any particulars evidencing that they

---

**16.** Rivera suggests that the discrepancy between the seniority of the white detectives who were promoted ahead of him and his own seniority might have been so great as to warrant an inference of discrimination even in the absence of any evidence regarding those detectives' other qualifications. In his deposition, he stated that "[i]f you're a police officer for only [sic] ten years and somebody with only three or four years gets promoted before you, there's something definitely wrong there." (Rivera Tr. at 66, Ex. I to Calistro Decl.) Other than Rivera's own speculation and conclusory remarks, Plaintiffs introduce no specific evidence in the record, however, to demonstrate that such great discrepancies existed and determined the promotions of other detectives.

were more qualified than Detectives Casse and O'Brien.[17]

Thus, the record before the Court does not contain sufficient evidence of specific facts regarding whether or not Defendants promoted less qualified white detectives ahead of Palermo and Rivera. As a result, Plaintiffs have failed to demonstrate a genuine dispute as to the fourth element of a prima facie claim of discrimination based on failure to promote. Accordingly, the Court finds that Defendants' motion for summary judgment with respect to Palermo's and Rivera's claims of discrimination based on failure to promote must be dismissed.

### D. TITLE VII DISPARATE TREATMENT CLAIMS

■ Defendants also move for summary judgment on Plaintiffs' claims of disparate treatment in violation of Title VII based on allegations that "they were required to work certain holidays and other assignments such as Prisoner Transport, denied various training courses and not assigned to certain tasks which would have enabled them to earn overtime." [18] (Defs.' Mem. at 15, 17.) "A plaintiff may establish a claim of disparate treatment under Title VII either (1) by showing that he has suffered an adverse job action under circumstances giving rise to an inference of discrimination on the basis of race, color, religion, sex, or national origin, or (2) by demonstrating that harassment on one or more of these bases amounted to a hostile work environment." *Feingold v. New York*, 366 F.3d 138, 149 (2d Cir.2004) (citation omitted). Plaintiffs do not explicitly specify the basis on which they seek to establish a prima facie case of disparate treatment, but their pleadings, as well as those of Defendants, indicate that Plaintiffs' disparate treatment claims are based on alleged adverse job actions, rather than an alleged hostile work environment.

Like Title VII claims of failure to promote, disparate treatment claims are analyzed according to the *McDonnell Douglas*

---

**17.** An examination of the record might indicate the approximate seniority of Michael O'Brien. Plaintiffs claim that a detective's tax identification number indicates his seniority. Rivera's tax number is 875789 and he was appointed to the NYPD in 1981. Palermo's tax number is 867159 and he was appointed in 1973. An NYPD memorandum entitled "Updated Recommendations for Promotion to Detective Second Grade," dated November 29, 1995, lists a detective named Michael O'Brien with tax number 878289. (*See* Ex. T to Bernstein Decl.) Assuming that this is the same Michael O'Brien whom Rivera alleges was promoted before him, it might be possible to estimate his date of appointment as approximately 1983, two years later than Rivera. (*See* Rivera Tr. at 67 ("The first three digits 875, anyone with that number came in in 1981 .... 878 you probably came in two years later.").) Plaintiffs, however, do not explicitly allege how much more senior Rivera was to Michael O'Brien.

**18.** While Defendants do not explicitly move for summary judgment with respect to Plain-

tiffs' disparate treatment claims based on Defendants' alleged denials of requests "to work on a particular team," (Defs.' Mem. at 17), they allude to those claims in their Memorandum of Law in Support of Motion for Summary Judgment. (*See id.*) Because Defendants do not clearly move for summary judgment with respect to these claims, the Court will not address them here. Although district courts may enter summary judgments sua sponte, it is improper to do so unless "the losing party was on notice that she had to come forward with all of her evidence." *Celotex*, 477 U.S. at 326, 106 S.Ct. 2548 (citations omitted). Because Defendants have not explicitly moved for summary judgment regarding Plaintiffs' disparate treatment claims based on Defendants' alleged refusal to allow them to work on particular teams, the Court finds that Plaintiffs have not received adequate notice of such a motion and, hence, declines to exercise its power to enter summary judgment against Plaintiffs regarding these claims.

framework. Defendants claim that Plaintiffs' allegations fail to establish a triable issue regarding a prima facie case of discrimination because the allegedly discriminatory acts "are simply not adverse employment actions as a matter of law." (Defs.' Mem. at 17.)

Although Plaintiffs mention some of these alleged acts of disparate treatment in their memorandum opposing Defendants' motion for summary judgment, (see Pls.' Mem. at 4–5 (alleging that Defendants denied Palermo's requests to attend professional courses and refused to allow him to work overtime)), they do not dispute Defendants' claim that they are not adverse employment actions, nor do they offer any affirmative argument that claims based on these disparate treatment allegations should survive summary judgment. The only evidence in the record before the Court supporting these allegations is the individual Plaintiffs' affidavits.

██ Gonzalez alleges in his affidavit that defendant Carroll directed a sergeant to call Gonzalez at home to order him to work on July 4, 1996, when it was another detective's turn to work that day.[19] (See Gonzalez Aff. ¶ 64, Ex. E to Bernstein Decl.) According to Gonzalez, Carroll's order was "unusual." (Id.)

The Court agrees with Defendants that an order to work on a holiday when not previously scheduled to do so does not qualify as an adverse employment action under Title VII. The Court finds that such an order is closer to "a mere inconvenience," than a "materially adverse change in the terms and conditions of employment." *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir.2000) (internal quotation marks and citations omitted). Like the plaintiff in *Galabya*,

Gonzalez has failed to demonstrate that the order that he work on July 4, 1996 "in any way harmed his career." *Id.* As a result, Plaintiffs have not raised a genuine dispute regarding a prima facie case of discrimination regarding this claim.

Palermo alleges in his affidavit that, at the end of several high-profile cases on which he worked, "when the overtime would come in, [he] was always sent home." (Palermo Aff. ¶ 19, Ex. H to Bernstein Decl.) He alleges that "[a]ll these other guys, not Hispanic, were getting all this overtime." (Id.) Palermo also lists several courses that he was not permitted to attend. He alleges that other detectives, including Roy Casse ("Casse"), Joel Poccia ("Poccia") and Willie Ortiz ("Ortiz"), were sent to those courses. Palermo does not explicitly allege Poccia's race or national origin. He states that Casse is "Caucasian," (id. ¶ 45), and that Ortiz "is Oriental looking." (Id. ¶ 38.)

██ Although Plaintiffs do not explain how these actions qualify as adverse employment actions, the Court finds that it is possible, depending on the circumstances, that they could qualify as such actions. For instance, repeated denials of the opportunity to work overtime and attend courses could "bear on either plaintiff's opportunities for professional growth and career advancement or directly on plaintiff's compensation." *Nakis v. Potter*, No. 01 Civ. 10047(HBP), 2004 WL 2903718, *20 (S.D.N.Y. Dec. 15, 2004). Even assuming that these actions qualify as adverse employment actions, though, Plaintiffs do not produce sufficiently specific evidence to support a reasonable inference of discrimination. For example, they do not address the basis on which NYPD decisions to allow detectives to work overtime or at-

---

**19.** Gonzalez fails to allege in his affidavit the race of the detective whose turn it allegedly was to work. Because this claim fails to survive summary judgment on other grounds, the Court will assume that the detective whose turn it allegedly was to work on the date in question (Patrick Boyle) is white.

tend courses are made or present any specific facts about the detectives who were permitted to work overtime and attend courses that would place them in a situation similar to Palermo. Therefore, these claims do not survive summary judgment.

Finally, Palermo alleges that Gorman "put [him] on uniform details," such as prisoner transport, while he was working undercover. As a result, he "felt that Gorman didn't care about [his] safety," (*id.* ¶ 39), because, "[i]f you're working undercover, you're not supposed to be seen." (*Id.* ¶ 40.) However, Palermo does not allege or provide supporting evidence to establish that white or other non-Hispanic detectives were not treated similarly. Therefore, Plaintiffs do not appear to assert or sufficiently demonstrate that this action was based on unlawful discrimination.

### E. *TITLE VII RETALIATION CLAIMS*

Title VII prohibits an employer from "discriminat[ing] against any of his employees ... because [the employee] has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e–3(a). Like claims of failure to promote, retaliation claims are generally governed by the *McDonnell Douglas* burden-shifting framework. *See Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 768 (2d Cir. 1998).

To establish a prima facie case of retaliation in violation of Title VII, a plaintiff must show that: (1) he or she participated in a protected activity; (2) the employer had knowledge of the plaintiff's participation in the protected activity; (3) the plaintiff suffered an adverse employment action; and (4) a causal connection exists between the protected activity and the adverse employment action. *See id.* at 768–769. If the plaintiff establishes a prima facie case of retaliation, the defendant must provide a non-discriminatory explanation for the adverse employment action. If so, the burden shifts to the plaintiff to demonstrate that a retaliatory motive nonetheless played a part in the adverse employment action, "whether or not it was the sole cause." *Terry v. Ashcroft,* 336 F.3d 128 (2d Cir.2003) (internal quotation marks omitted).

Plaintiffs argue that Defendants retaliated against them for filing complaints with the EEOC, for filing the present lawsuit and/or for participating in the LOA. Defendants do not dispute, and case law makes clear, that Title VII protects the first two of these activities. *See Richardson v. New York State Dept. of Correctional Service,* 180 F.3d 426 (2d Cir.1999) (citing *Gallagher v. Delaney,* 139 F.3d 338, 349 (2d Cir.1998)) ("There is no disagreement that Richardson engaged in protected activity when she ... filed her EEOC charge and filed her lawsuit.").

It is less clear whether membership in the LOA is a protected activity under Title VII.[20] Neither of the parties addresses this question. The Court notes that the LOA has filed other lawsuits in this Court

---

**20.** In another case filed in this District by the LOA, the court indicated that individual plaintiffs based certain of their Title VII claims on alleged retaliation for "membership and active participation in the LOA," *Latino Officers Ass'n v. City of New York,* 253 F.Supp.2d 771, 787 (S.D.N.Y.2003), and for "espousing the cause of the LOA." *Latino Officers Ass'n City of New York v. City of New York,* No. 99 CIV. 9568(LAK), 2002 WL 511548, at *1 (S.D.N.Y. Apr. 4, 2002). The court in that case did not address whether or not these activities are protected under Title VII because the case was not fully litigated, being terminated by means of a settlement agreement. *See Latino Officers Ass'n City of New York, Inc. v. City of New York,* No. 99 CIV. 9568(LAK), 2004 WL 2066605 (S.D.N.Y. Sept. 15, 2004).

against the NYPD alleging unlawful employment discrimination against LOA members in violation of Title VII. Thus, it is conceivable that membership in the LOA could constitute a protected Title VII activity, insofar as the individual Plaintiffs are able to sufficiently demonstrate their association with the organization and its involvement in Title VII protected activities, as well as Defendants' knowledge of the LOA's role in such activities and of Plaintiffs' LOA membership. *See* 42 U.S.C.2000e–3(a). Because Plaintiffs' retaliation claims fail on other grounds, the Court will not address this issue further and, for present purposes, will assume that under some circumstances membership in the LOA could qualify as a protected activity under Title VII.

■ Palermo alleges that Gorman retaliated against him by interfering with his efforts to obtain employment with the Bronx Detective Investigators (the "Bronx D.I.").[21] He states in his affidavit that "the day [he] went for the interview [at the Bronx D.I.], the people that were supposed to give [him] the interview were not there" and that he was subsequently informed that the Bronx D.I. was not hiring at the time. (Palermo Aff. ¶¶ 52–53.) Palermo states that it was "[his] gut feeling that

... Gorman had something to do with it, because it's right after [Palermo] put in the lawsuit ... that this thing came about." (*Id.* ¶ 55.)

Palermo does not specify the lawsuit to which he refers here, but the context and other parts of the record suggest that he refers to his EEOC complaint. Palermo states in his affidavit that the allegedly retaliatory act occurred in 1996. (*See* Palermo Aff. ¶ 54.) Given that the instant action was not filed until 2000 and that Palermo's EEOC complaint was filed on or about May 23, 1996, (*see* Complaint ¶ 9), it appears that the filing of the EEOC complaint is the alleged protected activity in Palermo's retaliation claim.[22] The Court will assume that this is the case.[23]

The record is also unclear regarding the remaining elements of Plaintiffs' prima facie case of retaliation. Plaintiffs do not address the question whether or not Gorman knew that Palermo had filed a complaint with the EEOC at the time that Gorman allegedly interfered with Palermo's attempt to obtain employment with the Bronx D.I., nor does the record contain any clear evidence on this issue. Palermo also fails to specify in what way Gorman allegedly interfered with his attempt to obtain a position with the Bronx

---

21. It appears, but is not clear, from the record that the Bronx D.I. is part of the Bronx District Attorney's Office, rather than a part of the NYPD. (*See* Gonzalez Aff. ¶¶ 7–8, Ex. E to Bernstein Decl. (discussing Gonzalez's attempt to gain employment as a "Detective Investigator" with the "Bronx District Attorney" upon retirement from the NYPD); *see also* Palermo Aff. ¶¶ 53–54, Ex. H to Bernstein Decl. (indicating that Palermo was seeking to obtain a position at the Bronx D.I. in anticipation of retiring from the NYPD.).) The Court will assume that the Bronx D.I. is an entity external to the NYPD.

22. Plaintiff's [sic] Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, dated May 26, 2004 ("Plain-

tiffs' Memo") does not clarify this issue. In fact, Plaintiffs' Memo does not clearly allege any retaliatory act against Rivera or Palermo. It merely states that they "were active members in the LOA" and that "[t]he LOA had a very acrimonious relationship with the NYPD, which refused to recognize them." (Pls.' Mem. at 19–20.)

23. Defendants interpret Palermo to allege that the protected activity at issue here is his membership in the LOA. They state that "Palermo's [retaliation] claim falters in that he is 'not sure' whether Captain Gorman ... even knew that he was an LOA member." (Defs.' Mem. at 18.) There is no indication in the record, though, that Palermo squarely bases his retaliation claim on his LOA membership.

D.I., other than his own speculation in stating that he "felt that Gorman made a phone call." (Palermo Aff. ¶ 52, Ex. H to Bernstein Decl.) Allegations as vague and speculative as these do not constitute evidence sufficient to raise a genuine dispute. See D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir.1998) (opponent of summary judgment may not rely "on mere conclusory allegations or speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful.").

█ Rivera claims that Defendants retaliated against him for belonging to the LOA by removing him from the pool of applicants for a position with the Joint Terrorist Task Force (the "Task Force"). Rivera states in his affidavit that he interviewed for a position with the Task Force in May 1997 and "was told an inspector would call Captain Gorman and Gorman would have to give a small written recommendation." (Rivera Aff. ¶ 39, Ex. M to Bernstein Decl.) According to Rivera, "Captain Gorman never gave [him] the recommendation necessary" and Rivera "was told that [his] name was scratched out" on the list of candidates that "went to headquarters." (Id. ¶ 40.)

Rivera does not explicitly allege that the reason for Gorman's alleged failure to recommend him and the alleged scratching out of his name was his membership in the LOA. He does, however, suggest such a claim by noting immediately after making these allegations that "[a]t that time [he] was an active member of the Latino Officers Association and Captain Gorman as well as the command was [sic] aware of this." [24] (Id.)

Plaintiffs do not provide any argument that Rivera's allegations in his affidavit support the second, third or fourth elements of a prima facie case of retaliation. Defendants argue that Rivera's retaliation claim fails due to his failure to establish the second element of a prima facie case, namely "that the decision-maker ... knew of his LOA membership." (Defs.' Mem. at 18.) The record indicates, however, that Gorman, the alleged agent of one aspect of the alleged retaliation (the failure to recommend Rivera), possessed at least some degree of awareness of Rivera's membership in the LOA. He stated in his deposition that he thought that Rivera "was somewhat involved with [the LOA]," but that he did not know whether "he was an officer or a delegate." (Gorman Tr. at 178–179, Ex. J to Bernstein Decl.)

The record is not clear, though, as to who was in charge of preparing and maintaining the list of Task Force candidates and who was responsible for the other alleged retaliatory act, the crossing out of Rivera's name from that list, or whether that person knew of Rivera's LOA membership. Rivera states generally in his affidavit that "the command was aware" of the fact that he was an active member of the LOA. (Rivera Aff. ¶ 40, Ex. M to Bernstein Decl.) He does not, however, provide evidence of any specific facts regarding who allegedly scratched his name out, why this act occurred, or whether that person knew of his LOA membership.

Reading the record in the light most favorable to Rivera, a fair inference could be drawn from Rivera's affidavit that it was widely known within the NYPD ranks

---

**24.** In his deposition, Rivera described his retaliation claim more clearly. In response to questions about his belief regarding why his name was taken off the list of candidates for the Task Force positions, he stated: "At this time I was involved with the Latino Officer Association. Captain Gorman knew that, a lot of people knew that, and I really personally believe that it was in retaliation because I was a member of that organization." (Rivera Tr. at 110, Ex. O to Calistro Decl.)

that he was an LOA member. Rivera states, for instance, that, at the time of the alleged retaliation, he was a board member of the LOA, attended LOA press conferences, and "would put up flyers in [his] office and throughout the DA's office building, and in commands [he] was visiting." (Rivera Aff. ¶¶ 41–42, Ex. M to Bernstein Decl.) Despite such indications that Rivera's LOA membership may have been widely known, Plaintiffs' failure to provide specific evidence regarding who was responsible for allegedly crossing his name off of the list of Task Force candidates and why, and whether that person knew that Rivera was an LOA member undermines their ability to demonstrate a genuine factual dispute regarding the element of knowledge. It may be presumed that the action was carried out by some unidentified Defendant, or another person acting at Defendants' behest. But it is Plaintiffs' burden to supply that identifying evidence in this case. There is no doctrine in Title VII equivalent to *res ipsa loquitur* permitting the Court to presume liability unless Defendants come forward with exonerating evidence. Therefore, Rivera's claim that the crossing out of his name from the list constituted retaliation fails.

Rivera's claim that Gorman's failure to recommend him constituted retaliation also fails. Even assuming that Gorman knew of Rivera's LOA membership and that Gorman's alleged failure to recommend[25] Rivera constitutes an adverse employment action, there is insufficient evidence on the record before the Court to create a genuine dispute regarding whether or not the alleged failure to recommend Rivera for the Task Force was causally related to Gorman's knowledge of his membership in the LOA. Rivera does not articulate any basis to support a reasonable finding that Gorman's alleged failure to write the recommendation was based on Gorman's awareness that Rivera was a member of the LOA, other than Gorman's awareness itself. Gorman's knowledge of Rivera's activities with the LOA, though, is not by itself sufficient to generate an inference of causation. If it were, any adverse employment action ever taken against any employee known to belong to the LOA could generate an inference of unlawful discrimination. For these reasons, there is no genuine dispute regarding the fourth element of Rivera's prima facie case of retaliation and that claim must be dismissed.

█ Finally, Gonzalez claims that Carroll, his supervisor in the 43rd Squad, retaliated against him for accusing Carroll of discrimination against minorities and for Gonzalez's filing the present lawsuit. The Court will address each of these claims individually.

Gonzalez states in his affidavit that, "[a]fter accusing Lieutenant Carroll of being discriminating toward minority detectives, [Gonzalez] was transferred out of the 43rd Squad in 1997." (Gonzalez Aff. ¶¶ 61–62, Ex. E to Bernstein Decl.) He alleges that this transfer[26] adversely impacted

---

**25.** The parties dispute whether or not Gorman did in fact fail to recommend Rivera. (*See* Gorman Tr. at 182, 187, Ex. J to Bernstein Decl.)

**26.** It is unclear from the record whether this transfer is the same as a transfer to which Gonzalez refers later in his affidavit, and which he attributes to a different allegedly protected activity. He states: "On July 10, 1997 I had a conversation with Captain Dil-

lon the zone supervisor. I made a written request for consideration [for promotion] to second grade via the chain of command directly to Captain Dillon. Shortly thereafter I was transferred to the Special Victims Squad. I absolutely attribute the transfer to making the request for a promotion to the chain of command." (*Id.* ¶ 72.) Because Gonzalez does not specify the destination of the transfer that he attributes to his accusation of Dillon, it is not clear whether there were two differ-

him because it forced him to "start[ ] from the ground floor." (*Id.* ¶ 63.)

Plaintiffs do not offer any argument that the activity that allegedly gave rise to Gonzalez's transfer is protected under Title VII, nor do Defendants address this issue. Because Gonzalez does not elaborate on the nature of his accusation of Carroll, it is difficult for the Court to determine whether it constitutes a protected activity under Title VII. As the court in *Lapsley v. Columbia University–College of Physicians and Surgeons,* 999 F.Supp. 506 (S.D.N.Y.1998), noted, "although 'informal protests of discrimination' may constitute protected activity, 'careless and uncounselled accusations of discrimination' are not necessarily protected." *Id.* at 524 (quoting *Sumner v. United States Postal Serv.,* 899 F.2d 203, 209 (2d Cir.1990); *Bray v. Tenax Corp.,* 905 F.Supp. 324, 328 (E.D.N.C.1995)). Plaintiffs also fail to provide the Court with adequate information to determine whether Gonzalez's transfer itself constituted an adverse employment action. Although Gonzalez alleges that he was adversely affected by the transfer in that it placed him "in a situation where [he] was not known and ... had to show and prove who [he] was," (Gonzalez Aff. ¶ 63, Ex. E to Bernstein Decl.), he does not elaborate with any greater specificity how his employment terms, conditions or status were affected. He has not alleged, for example, "a decrease in wage or salary, a material loss of benefits, significantly diminished material responsibilities," or other legally cognizable measures of an adverse employment action. *Williams,*

199 F.Supp.2d at 178 (citing *Galabya,* 202 F.3d at 640). Moreover, the adverse consequence that Gonzalez does allege—becoming acquainted with a new work environment—would presumably accompany almost any transfer, whether to an inferior or superior position, as it is inherent in entering any new job assignment.

Even assuming that Carroll's alleged transfer of Gonzalez in 1997 constituted an adverse employment action, this retaliation claim fails because Plaintiffs do not demonstrate a triable issue of fact with respect to any causal role that Gonzalez's accusation of Carroll might have played with respect to his transfer. Although timing alone can in some cases form a sufficient basis for inferring causation, the Supreme Court has observed that "cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close." *Clark County School District v. Breeden,* 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (internal quotation marks and citations omitted). In support of this observation, the Court cited, inter alia, *Richmond v. ONEOK, Inc.,* 120 F.3d 205 (10th Cir.1997), which held a three-month period to be too large a span to establish a causal connection. Gonzalez does not specify how much time passed between his allegedly protected activity of accusing Carroll of discrimination and Gonzalez's transfer out of the 43rd Squad. Nor does he allege any

---

ent transfers in 1997, or a single transfer. In his deposition, Gonzalez stated that Dillon rescinded his transfer to the Special Victims Squad. This statement suggests that the transfer that was allegedly in retaliation for accusations made against Carroll is distinct from the transfer to the Special Victims Squad because, according to Gonzalez, the former transfer "destroyed [his] career."

(Gonzalez Aff. ¶ 62, Ex. E to Bernstein Decl.) Given that Gonzalez's transfer to the Special Victims Squad was rescinded shortly after it was ordered and may in fact never have been implemented, it seems highly unlikely that it could have destroyed Gonzalez's career. Therefore, the Court will assume that there were two transfers (or transfer orders) in 1997.

other circumstances to suggest causation. Therefore, the Court finds that Plaintiffs have not produced sufficient evidence to create a genuine dispute regarding the fourth element of a prima facie case with respect to Gonzalez's first retaliation claim.

██ Gonzalez's second claim of retaliation alleges that Carroll retaliated against him for filing the present lawsuit by refusing to recommend him for employment with the Bronx District Attorney (the "District Attorney's Office"). In this case, the record provides strong evidence that Carroll refused to recommend Gonzalez specifically and exclusively because of the present lawsuit. In his deposition, Carroll stated that he had told the District Attorney's Office: "I wouldn't recommend [Gonzalez]. He was in the process of suing me federally for not getting promoted.... I think that was my chief reason [for not recommending him]." (Carroll Tr. at 134, Ex. R to Bernstein Decl.; *but see id.* at 52 (stating: "Absent the lawsuit, I wouldn't have recommended him.... I didn't know if Ruben would fit in [at the District Attorney's Office].").)

Although Plaintiffs do not address the question of how the failure to recommend Gonzalez to the District Attorney's Office constitutes an adverse employment action, case law indicates that such conduct would be sufficient to violate Title VII. In *Beckett v. Prudential Ins. Co. of America,* 893 F.Supp. 234 (S.D.N.Y.1995), the court noted that "[p]oor recommendations, refusals to furnish recommendations, or threats to future employers may be discriminatory practices if done in direct retaliation for a former employee's opposition to any unlawful employment practice." *Id.* at 240. Given the clear evidence in this case that Carroll's refusal to recommend Gonzalez was based at least in part on the filing of the present lawsuit, Gonzalez's retaliation claim based on that refusal could support a finding of unlawful discrimination. There-

fore, Gonzalez's retaliation claim based on Carroll's refusal to recommend him to the District Attorney's Office survives summary judgment.

## F. TITLE VII PATTERN AND PRACTICE CLAIM

██ Plaintiffs allege that Defendants engaged in a pattern and practice of discrimination based on race, national origin, and opposition to discrimination by denying Plaintiffs and other similarly situated minority detectives promotions to Detective Second Grade and Detective First Grade, by disproportionately requiring Hispanics to work undercover, and by giving such detectives harsher evaluations than to white detectives. In order to prove a discriminatory pattern and practice in violation of Title VII, the plaintiff "must establish that intentional discrimination was the defendant's 'standard operating procedure.'" *Robinson v. Metro–North Commuter Railroad Co.,* 267 F.3d 147, 158 (2d Cir.2001) (quoting *Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 336, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977)). The core of such a showing typically is statistical evidence. *Id.* at 158 n. 5.

Courts also use the *McDonnell Douglas* burden-shifting approach to evaluate claims that an employer has engaged in a pattern and practice of discrimination. *See International Bhd. of Teamsters,* 431 U.S. at 336, 97 S.Ct. 1843; *Robinson v. Metro–North Commuter R.R. Co.,* 267 F.3d 147, 158 (2d Cir.2001). After the plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant to discredit the evidence presented. The plaintiff bears the ultimate burden of showing, by a preponderance of the evidence, a pattern and practice of discrimination. *See Robinson,* 267 F.3d at 159 (citing *Teamsters,* 431 U.S. at 336, 97 S.Ct. 1843).

Plaintiffs base their pattern and practice claim relating to the failure to promote Hispanic detectives on NYPD statistics indicating the percentage of detectives of all grades who are Hispanic and the percentage of Second and First Grade Detectives who are Hispanic. According to these statistics, in 1996, Hispanics comprised 17.8 percent of all detectives, 15.1 percent of Detectives Second Grade, and 11.9 percent of Detectives First Grade. Whites, on the other hand, comprised 62.5 percent of all detectives, 65.7 percent of Detectives Second Grade, and 69.7 percent of Detectives First Grade. (Participation Charts for New York City Police Department by Sex and Ethnicity, Ex. U to Bernstein Decl.) [27]

These statistics, however, have little probative value as evidence of a discriminatory promotion pattern or practice because they do not specify how many Hispanic Detectives Third Grade were qualified and eligible for promotion to Second Grade or how many Hispanic Detectives Second Grade were qualified and eligible for promotion to First Grade. *See Hazelwood School District v. United States*, 433 U.S. 299, 308 n. 13, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977) ("When special qualifications are required to fill particular jobs, comparisons to the general population (rather than to the smaller group of individuals who possess the necessary qualifications) may have little probative value."); *Pegues v. Mississippi State Employment Service of Mississippi*, 699 F.2d 760, 766–767 (C.A.Miss.1983) (noting inadequacy of charts showing disproportionate classification of blacks in codes for less desirable service occupations, and of women in lower paying jobs because they failed to "show that race or sex, rather than work preferences, experience, education, and the state of the job market caused the imbalances.") (citing D. Baldus & J. Cole, *Statistical Proof of Discrimination*, § 1.22[23] (1980)).[28] Moreover, Plaintiffs fail to offer any evidence that the disparities between the percentage of Second and First Grade Detectives who are white and the percentage who are Hispanic is the result of discriminatory intent. Therefore, Plaintiffs' pattern and practice claim regarding promotions of Hispanic detectives fails.

In support of their claim that Defendants engage in a pattern and practice of subjecting Hispanics to harsher standards of discipline than non-minority officers and disproportionately require Hispanics to work undercover (which is allegedly more dangerous than working in uniform), Plaintiffs cite to a 1994 report by the Hispanic National Law Enforcement Association. Plaintiffs do not explain on what basis this report could be considered admissible evi-

27. Plaintiffs state that these statistics over-represent the number of Hispanics among Second and First Grade Detectives because they include detectives with the New York City Transit Police, which "had a system to promote Detectives from 3rd to 2nd [Grade] after a specified number of years in service," (Pls.' Mem. at 17), and which merged with the NYPD in 1995. They do not, however, specify the extent to which the merger affects these statistics.

28. Plaintiffs also cite to a 1998 report by the Mayor's Task Force on Police/Community Relations in support of their claim of a pattern and practice of discrimination with respect to Defendants' promotion of Hispanic detectives. Even assuming that it is admissible evidence, this report only shows the percentage of detectives of all grades who were Hispanic at the time (18.6 percent) and the discrepancy between the percentage of the general population of New York City that was Hispanic (25 percent) and the percentage of the NYPD as a whole that was Hispanic (17 percent). These statistics are not probative regarding promotions of Hispanic detectives to Detectives Second and First Grade because they do not indicate the percentage of Hispanic in the three grade levels of detectives at all.

dence for the purposes of their instant motion, or how they would otherwise overcome hearsay objections to it at any trial of this matter. Nonetheless, putting aside these impediments, the statistics in the cited report pertain only to the disparity between the percent of Hispanics in the general population in New York City (24.35 percent) and the percent of Hispanics among uniformed police officers (14.1 percent). (Report on Issues of Discrimination Against Hispanics in the Criminal Justice System, dated March 16, 1994, at 3, Ex. W to Bernstein Decl.) The remaining evidence cited in the report lacks sufficient precision to provide any support to Plaintiffs' claims (*see, e.g., id.*) (noting that a survey indicated that "Hispanic officers receive harsher penalties as compared to white officers when involved in incidents where disciplinary action is warranted."). Therefore, these claims also fail to survive summary judgment.[29]

Finally, Plaintiffs do not introduce any evidence at all to suggest that Defendants engaged in a pattern and practice of discriminatory behavior with respect to individuals who oppose NYPD practices they allege are discriminatory.

## G. *FAILURE TO PROSECUTE*

Defendants argue that Plaintiffs' claims on behalf of the LOA should be dismissed pursuant to Rule 41(b) for failure to prosecute. According to Defendants, Plaintiffs have failed to prosecute their claims on behalf of the LOA by failing to respond adequately to interrogatories and by failing to produce a witness, former LOA President Anthony Miranda, for deposition.

Rule 41(b) permits a defendant to move for dismissal of an action or a claim in cases where the plaintiff fails to "prosecute or to comply with [the Federal Rules of Civil Procedure] or any order of court." Fed.R.Civ.P. 41(b). Despite this inclusive language describing the sorts of violations that parties may seek to redress under Rule 41(b), the Supreme Court has held that "whether a court has power to dismiss a complaint because of noncompliance with a production order depends exclusively upon [Federal] Rule [of Civil Procedure] 37, which addresses itself with particularity to the consequences of a failure to make discovery. . . . There is no need to resort to Rule 41(b), which appears in that part of the Rules concerned with trials and which lacks such specific references to discovery." *Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers,* 357 U.S. 197, 207, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958); *see also Chambers v. NASCO, Inc.,* 501 U.S. 32, 49 n. 14, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (noting that, "because individual rules address specific problems, in many instances it might be improper to invoke one when another directly applies.") (citation omitted); *Roland v. Salem Contract Carriers, Inc.,* 811 F.2d 1175, 1178 n. 4 (7th Cir. 1987) (noting "that Rule 41(b) would be an inappropriate basis for a dismissal solely for the plaintiffs' failure to comply" with a discovery order).

Although Defendants in the instant case move for dismissal of individual claims, rather than of the entire complaint, the Supreme Court's reasoning in *Societe Internationale* applies equally to the present

---

**29.** The record also contains newspaper articles that appear to be offered in support of Plaintiffs' pattern and practice claims, but which are not discussed or cited in Plaintiffs' memorandum of law in opposition to the summary judgment motion. "However, 'newspaper articles [are] inadmissible hearsay and unusable to defeat summary judgment.'" *Miles v. City of New York,* No. CV–99–7365JGRLM, 2002 WL 31410346, *4 n. 3 (E.D.N.Y. Oct 24, 2002) (quoting *Ladner v. City of New York,* 20 F.Supp.2d 509, 519 (E.D.N.Y.1998)).

circumstances. Here, as in that case, the exclusive basis for the motion to dismiss is a failure relating to the discovery phase of litigation, rather than to an aspect of the trial. Therefore, the Court denies Defendants' motion to dismiss pursuant to Rule 41(b), without prejudice to their filing a motion for sanctions pursuant to Rule 37.

Based on the record before the Court, it appears that some form of sanction may be appropriate in light of Plaintiffs' apparent non-compliance with discovery orders. Further proceedings regarding the nature of the interrogatories that Plaintiffs have allegedly failed to answer and whether Defendants already possess any of the information sought by the interrogatories would be necessary prior to the imposition of any sanctions. Should Defendants choose to file a Rule 37 motion, they must provide the Court with specific information regarding the length of Plaintiffs' alleged delay in providing the requested information[30] and making Anthony Miranda available for deposition, as well as the specific nature and significance of the information sought by the interrogatories to the adequate preparation of a defense.

### III. *ORDER*

For the reasons set forth above, it is hereby

ORDERED that the motion of Defendants for partial summary judgment is granted in part. The Court denies summary judgment on the claim of plaintiff Ruben Gonzalez ("Gonzalez") that Defendants unlawfully retaliated against him for filing the instant lawsuit; grants summary judgment on Gonzalez's · remaining

claims—specifically, his claims pursuant to Title VII, 42 U.S.C. §§ 1981, 1983, and 1985, New York City Administrative Code § 8–107(1) *et seq.,* New York City Human Rights Law, and New York State Executive Law § 296—except to the extent that these claims are based on Gonzalez's allegations that Defendants failed to promote him; and grants summary judgment on the claims of plaintiffs Reinaldo Palermo and Sammy Rivera, specifically, their claims under Title VII, 42 U.S.C. §§ 1981, 1983, and 1985, New York City Administrative Code § 8–107(1) *et seq.,* New York City Human Rights Law, and New York State Executive Law § 296; and it is also

ORDERED that the motion of Defendants to dismiss the claims of plaintiff the LOA for failure to prosecute is denied, without prejudice to Defendants' filing a motion to dismiss, or for lesser sanctions pursuant to Federal Rule of Civil Procedure 37.

The Clerk of the Court is directed to enter judgment with respect to those claims dismissed upon summary judgment.

SO ORDERED.

---

**30.** Neither Plaintiffs nor Defendants specify the exact duration of the delay allegedly caused by Plaintiffs' failure to prosecute. Defendants only allege that, when Magistrate Judge Michael H. Dolinger signed an order dated May 1, 2003, requiring the LOA to provide previously requested discovery, the interrogatories directed toward the LOA "had been outstanding for several *years.*" (Defs.' Mem. at 4 (emphasis in original).)