**Kenneth R. THORNLEY,**
**Plaintiff–Appellee,**

v.

**PENTON PUBLISHING, INC.,**
**Defendant–Appellant.**

**No. 1670, Docket 96–7033.**

United States Court of Appeals,
Second Circuit.

Argued July 19, 1996.

Decided Jan. 7, 1997.

Leon M. Rosenblatt, West Hartford, CT, for Plaintiff-Appellee.

Ronald J. James, Cleveland, OH (Squire, Sanders & Dempsey, Cleveland, OH, and Jeffrey J. Mirman and Nicole I. Mason, Levy & Droney, Farmington, CT, on the brief), for Defendant-Appellant.

Before: WINTER, and LEVAL, Circuit Judges, and THOMPSON, District Judge.[1]

LEVAL, Circuit Judge:

Plaintiff Kenneth R. Thornley brought this action against his former employer, Penton

1. The Honorable Alvin W. Thompson, United States District Judge for the District of Connecti- cut, sitting by designation.

Publishing Co., alleging that it discharged him in willful violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq.* (ADEA). The jury found for plaintiff and awarded damages of $525,000, to be doubled because of willfulness. Penton appeals on numerous grounds, including the court's charge defining the plaintiff's burden, the sufficiency of the evidence, a variety of evidentiary rulings, misconduct of plaintiff's counsel, and errors in the calculation of damages. We agree with Penton that the district judge improperly charged the jury. We vacate the judgment and remand for a new trial.

### Background

Penton is a large trade publisher whose titles include the magazine New Equipment Digest (NED). NED hired Thornley as a district sales manager in 1967, and promoted him in 1980 to senior regional manager. Thornley's duties consisted primarily of selling advertising space.

In 1989, Thornley was fired. Penton asserts it fired him because his performance was unacceptable for most of the last ten years of his employment, particularly because his advertising sales trailed those of his counterparts at NED's major competitor, Industrial Equipment News (IEN). Penton maintains that it expected its ad salesmen to outsell the competition, and that Thornley was consistently unable to do so.

There was substantial evidence in the record supporting Penton's claim that it had been unhappy with Thornley's performance for years preceding his termination. Penton executives sent Thornley several letters criticizing his poor performance and market share relative to IEN. A 1981 memo noted the "severity of [his] territorial situation," and suggested changes in his selling strategy. In 1982, his sales levels were characterized as "totally unacceptable"; he was cautioned that he had "gotten off track" and had to "get back on ... immediately." In 1986, Thornley's sales territory, and salary, were substantially reduced; as Thornley's boss explained, his market share compared to IEN was extremely poor and "we cannot let this continue." After a precipitous drop in sales

in early 1988, Thornley was ordered to "stop the bleeding on several of these accounts that are currently killing you," and informed that "something must be done." In early 1989, Thornley was fired. Penton has consistently maintained that it discharged Thornley solely because of his poor performance.

Thornley contended that his periods of poor performance between 1980 and 1989 were the result of short-term health problems and that his overall sales record was strong. He offered evidence that supervisors described his performance as "truly outstanding" in 1983, and that he was commended in 1984 for a "remarkable increase in business." He won a "salesman of the year" award in 1987. Were it not for time lost due to a lingering shoulder injury, Thornley claimed, his 1988 sales would again have been excellent.

Thornley contended that Penton's justifications for his discharge were pretextual, and that his discharge was the result of age discrimination. He characterized the warning memos he received as a strategic tool, noting that other salesmen were also sent critical letters in order to motivate them to work harder.

Thornley introduced additional evidence from which, he argued, a jury could infer discriminatory intent. He offered evidence that, while discharging him, Penton retained other, younger, salesmen with inferior performance records. After Thornley's discharge, his territories were reassigned to much younger salesmen. During cross-examination, Penton's CEO admitted to having made a prior statement that the retirement of several long-time Penton employees was necessary because otherwise "we can't move anyone up." Taken together, Thornley argued, the evidence he presented supported an inference that he was discharged because of his age, and that Penton's claims to the contrary were pretextual.

### Discussion

As noted above, Penton contests many of the court's rulings. One ruling in particular—on the plaintiff's burden of proof—convinces us that a new trial is required. This

relates to the court's charge on the standard for determining whether the plaintiff was qualified for the position.

■ Penton had requested a charge that plaintiff was required, as a part of his demonstration of discrimination, to show that he satisfied the expectations of *his* employer, in accordance with *Meiri v. Dacon*, 759 F.2d 989, 995 (2d Cir.), *cert. denied*, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985). Plaintiff opposed Penton's request. After discussion in the charge conference, the court rejected Penton's position, and charged the jury that the factors to be considered in deciding whether Penton discharged Thornley based on his age included whether he was "sufficiently competent to satisfy the legitimate expectations of *an* employer." This was error.

■ The Supreme Court specified in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), that the *prima facie* case in an employment discrimination suit includes a showing that the plaintiff was "qualified" for the position. As we understand this element, being "qualified" refers to the criteria the employer has specified for the position.[2] Thus, in cases of alleged discriminatory discharge, we have occasionally analyzed this element in terms of whether plaintiff shows "satisfactory job performance" at the time of the discharge. *See, e.g., Quaratino v. Tiffany & Co.*, 71 F.3d 58, 64 (2d Cir.1995); *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir.1994); *Song v. Ives Lab., Inc.*, 957 F.2d 1041, 1045 (2d Cir.1992); *Meiri*, 759 F.2d at 995. Whether job performance was satisfactory depends on the employer's criteria for the performance of the job—not the standards that may seem reasonable to the jury or judge.

■ Absent a showing by the plaintiff that the employer's demands were made in bad faith, *see Meiri*, 759 F.2d at 995, an employer who is sued on allegations of age discrimination is not compelled to submit the reasonableness of its employment criteria to the assessment of either judge or jury. *See Montana v. First Fed. Sav. and Loan Ass'n*, 869 F.2d 100, 106 (2d Cir.1989). *See also Stanojev v. Ebasco Servs., Inc.*, 643 F.2d 914, 921–22 (2d Cir.1981) (employee may be discharged "on the basis of subjective business judgments, for any reason that is not discriminatory") (citation omitted). For example, an employer of salespeople may require that they dress and interact with customers in a specified manner. A plaintiff is not entitled to get his or her case before a jury by contending that the demands of the employer were not reasonably related to the performance of the job.

Plaintiff contends that in *Owens v. New York City Housing Authority*, 934 F.2d 405 (2d Cir.), *cert. denied*, 502 U.S. 964, 112 S.Ct. 431, 116 L.Ed.2d 451 (1991), we rejected the "satisfactory performance" standard. Several district courts have similarly interpreted *Owens. See Evans v. Connecticut*, 935 F.Supp., 145, 157 (D.Conn.1996); *Mulqueen v. Daka, Inc.*, 909 F.Supp. 86, 90–91 (N.D.N.Y.1995), *aff'd*, 104 F.3d 351 (2d Cir. 1996) (unpublished opinion). We believe this is a misreading. In *Owens*, the district court had granted summary judgment in favor of the employer based on the theory that a prior state court finding that the plaintiff had committed misconduct on the job collaterally estopped her from presenting a *prima facie* case of discrimination. *Id.* at 408. We reversed because the state court's finding of misconduct did not conclusively establish that the plaintiff had not performed the job satisfactorily. *Id.* at 409. The point of our ruling was that "misconduct"—the fact established in the state court action—did not correspond to the question of satisfactory performance— the issue at stake in the federal suit. Although misconduct indicates a high likelihood

---

**2.** *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 243–44, 109 S.Ct. 1775, 1787, 104 L.Ed.2d 268 (1989) (discussing approvingly the Title VII interpretive memorandum prepared by Senators Case and Clark, co-managers of the bill in the Senate). As *Price Waterhouse* explains, Title VII was intended to prohibit only an employer's use of race, color, religion, sex, and national origin, as employment criteria; "[a]ny other criterion or qualification for employment is not affected." 490 U.S. at 244, 109 S.Ct. at 1787 (*quoting* 110 Cong. Rec. 7213 (1964)). The same considerations apply to suits under the ADEA. *See Pena v. Brattleboro Retreat*, 702 F.2d 322, 323 (2d Cir.1983).

that an employee's performance is not satisfactory, this is not necessarily the case. Depending on the employer's standards, it is at least theoretically possible that an employee committed some misconduct and yet, in the aggregate, performed satisfactorily. Thus the state court's judgment, which conclusively established "misconduct," did not by the same token establish "unsatisfactory performance."

*Owens* did not depart from our holdings that a plaintiff complaining of discriminatory discharge shows "qualification" by demonstrating satisfactory job performance, in accordance with the particular employer's criteria for satisfactory performance. We adhere to the position that a plaintiff must satisfy the employer's honestly-held expectations. Accordingly, the instruction given by the district court was incorrect.

It does not necessarily follow that the judgment should be vacated. Thornley argues, first, that Penton forfeited the right to appeal the erroneous instruction by failing to take exception to the charge given prior to the start of jury deliberations. *See* Fed. R.Civ.P. 51; *Johnson v. New York Hosp.*, 96 F.3d 33, 34 (2d Cir.1996). Second, Thornley claims that, even if the instruction was erroneous, the error was harmless in the context of the overall charge.

■ As to the claim of forfeiture, we have on occasion excused a party's failure to take exception when the party had previously made its position clear to the trial judge and any further attempt to change the judge's mind would have been futile. *See Anderson v. Branen*, 17 F.3d 552, 556–57 (2d Cir.1994); *Ostrowski v. Atlantic Mut. Ins. Co.*, 968 F.2d 171, 177–79 (2d Cir.1992); 9A Charles Alan Wright and Arthur R. Miller, *Federal Practice and Procedure* § 2553, at 411 (2d ed. 1995). Because Penton argued its position to the district judge, who rejected it, a further exception after delivery of the charge would have been a mere formality, with no reasonable likelihood of convincing the court to change its mind on the issue.

■ Nor do we find that the error was harmless. Thornley contends that the error

was cured by the court's instruction that Thornley "has the burden of proving ... that the explanation given by Penton [for his discharge] is not true." We cannot accept this argument. The error in the charge was that it permitted the jury to infer discrimination based on whether the jury found the employer's standards to be reasonable. The jury is certainly entitled to reject the standards claimed by the employer on the grounds that these standards were pretextual—*i.e.*, they were not held in good faith. *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465–66 (2d Cir.1989). But if the employer's standards are held in good faith, they cannot be the basis of a finding of prohibited discrimination merely because other employers have less exacting standards or because the jury believes the standards to be unreasonable. Plaintiff's counsel exacerbated the risk of confusion by explicitly arguing the erroneous proposition to the jury. Counsel argued that Thornley was not required

> to show that [he] satisfied [his supervisors]. Our burden under the law is to show you that he satisfied the legitimate expectations of an employer.

Counsel then went on to note that Thornley was actually hired by Penton's competitor after his discharge, and argued to the jury that this was "proof positive that Ken Thornley ... was able to fulfill the legitimate expectations of an employer."

We cannot be confident that the jury did not rest its verdict on the conclusion that Penton's demands on its employees were unreasonable and that an average employer would have found Thornley's performance acceptable. Given the importance in this case of a proper focus on the standards set in good faith by the employer, we reject Thornley's argument that the erroneous instruction was harmless.

■ Although the erroneous jury instruction mandates vacation of the judgment against Penton, we reject Penton's further contention that Thornley failed to adduce sufficient evidence at trial to sustain a verdict and that it is therefore entitled to judgment as a matter of law. Thornley presented evidence at trial suggesting that he met Penton's true expectations, and that Penton's

assertions that he was fired because he failed to outsell IEN were pretext. Thornley submitted evidence that he had done as well as any other Penton employee, and that sales comparisons with IEN were only one of multiple criteria by which Penton evaluated its employees and that Thornley satisfied other criteria that were more important to Penton. In addition, he introduced evidence that Penton habitually wrote highly critical memos to its employees during any period of downturn in order to motivate them, and that such memos did not necessarily indicate dissatisfaction with the recipient's performance. Also, there was evidence that, two months before his discharge, his boss told Thornley's wife that Thornley was one of his best employees. Combined with Thornley's evidence suggesting a prohibited age-based motive for his discharge, we conclude that, although the issue is close, the evidence was legally sufficient to sustain a verdict in Thornley's favor. We reject Penton's contention that it was entitled to judgment as a matter of law, *see Song*, 957 F.2d at 1046–47, and accordingly remand for retrial.

■ We think it appropriate to give guidance on certain issues that may arise again on retrial. The remedy in a discriminatory discharge case is intended to compensate a plaintiff only for "losses suffered as a result of defendant['s] discrimination," and does not extend to granting back pay for a period when a plaintiff would have been unable, due to an intervening disability, to continue employment. *Saulpaugh v. Monroe Community Hosp.*, 4 F.3d 134, 145 (2d Cir.1993), *cert. denied*, 510 U.S. 1164, 114 S.Ct. 1189, 127 L.Ed.2d 539 (1994) (citation omitted). Thornley's counsel conceded at trial that Thornley was not entitled to back pay for any period after the Social Security Administration's finding of disability.[3] We interpret this concession as referring to the date found by the Social Security Administration as the onset of the disability, and not, as Thornley's

counsel contended at argument, to the date upon which it made the finding—a date that bears no logical relationship to the issue.

■ In the event Penton is found liable, a second question may arise as to whether any award by reason of Thornley's loss of payments under Penton's long-term disability plan should be reduced to reflect the social security payments he received. In fashioning a remedy for discrimination, a court should place "[t]he injured party ... as near as may be, in the situation he would have occupied if the wrong had not been committed." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418–19, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975) (quoting *Wicker v. Hoppock*, 6 Wall. 94, 99, 18 L.Ed. 752 (1867)). If Thornley would have continued his employment with Penton but for Penton's discriminatory actions, then he would have qualified for benefits under Penton's long-term disability plan once he became totally disabled. Under the terms of that plan, however, a beneficiary must apply for social security payments, and the benefit amount is reduced by their receipt. Any damage award based on Thornley's entitlement under Penton's disability plan must be similarly reduced.

Thornley contends that this method of calculation violates a widely accepted rule against using benefits received from a collateral source to reduce a damage award. *See, e.g., Promisel v. First American Artificial Flowers, Inc.*, 943 F.2d 251 (2d Cir.1991), *cert. denied*, 502 U.S. 1060, 112 S.Ct. 939, 117 L.Ed.2d 110 (1992) (noting cases ruling that social security benefits should not be set off from ADEA lost wages award, although not reaching the issue); *Maxfield v. Sinclair Int'l*, 766 F.2d 788, 793–94 (3d Cir.1985), *cert. denied*, 474 U.S. 1057, 106 S.Ct. 796, 88 L.Ed.2d 773 (1986) (refusing to offset social security benefits); *Guthrie v. J.C. Penney Co., Inc.*, 803 F.2d 202, 209 (5th Cir.1986) (same); *Gaworski v. ITT Commercial Finance Corp.*, 17 F.3d 1104, 1112 (8th Cir.),

---

**3.** Because Thornley conceded that the Social Security Administration's finding of disability would determine the date of Thornley's inability to work (and thus the date from which any back pay would cease and damages would instead be calculated under Penton's disability plan), we need not address whether Thornley's representa-

tions to the SSA would preclude him from challenging in the district court the date of his disability. *Cf. Bollenbacher v. Helena Chem. Co.*, 934 F.Supp. 1015, 1027 (N.D.Ind.1996); *Miller v. U.S. Bancorp*, 926 F.Supp. 994, 999 (D.Ore. 1996), and cases cited therein.

*cert. denied,* —— U.S. ——, 115 S.Ct. 355, 130 L.Ed.2d 310 (1994) (same). We have never decided whether the collateral source rule is applicable in a case of this nature, and need not do so here. To the extent that an award in Thornley's favor seeks to compensate him for his loss of benefits under Penton's disability plan, any social security benefits Thornley received must be deducted because the contract so requires. Any award for back pay should be determined by reference to the amounts that Thornley would have received under the terms of his employment contract with Penton. To the extent that contract entitled him to disability benefits, those benefits called for an offset of his social security entitlements. The collateral source rule does not apply to this straightforward question of contract interpretation.

### Conclusion

The judgment of the district court is vacated, and the case is remanded for a new trial.