19-127 (L)
*Emamian v. Rockefeller Univ.*

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term 2019

(Argued: February 28, 2020      Decided: August 19, 2020)

Nos. 19-127, 19-168

_____

EFFAT S. EMAMIAN

*Plaintiff-Appellant-Cross-Appellee*

-v.-

ROCKEFELLER UNIVERSITY

*Defendant-Appellee-Cross-Appellant*

_____

Before:      LIVINGSTON and PARK, *Circuit Judges*, and UNDERHILL, *District Judge*.[1]

On February 28, 2018, following a six-week trial, a jury returned a verdict in favor of Plaintiff-Appellant-Cross-Appellee Dr. Effat S. Emamian ("Emamian") on her claim of intentional discrimination on the basis of race or national origin by her former employer, Rockefeller University ("Rockefeller"). Both parties appealed the final judgment of $250,000 in back pay and $200,000 in remitted emotional distress damages. Emamian contends that the district court erred by

---

[1] Chief Judge Stefan R. Underhill, of the United States District Court for the District of Connecticut, sitting by designation.

failing to instruct the jury as to punitive damages, while Rockefeller argues that judgment in its favor or a new trial is warranted because of prejudicial defects in the jury instructions and verdict form and due to the district court's decision to recall the previously discharged jury and to permit the jury to complete a second verdict form after the jurors requested an opportunity to correct a mistake. A summary order issued simultaneously with this opinion addresses the parties' remaining arguments. We find no merit in the arguments asserted by either party. Accordingly, the judgment of the district court is AFFIRMED.

FOR PLAINTIFF-APPELLANT-CROSS-APPELLEE:

JONATHAN C. MOORE (Luna Droubi and David B. Rankin, *on the brief*), Beldock Levine & Hoffman LLP, New York, NY.

FOR DEFENDANT-APPELLEE-CROSS-APPELLANT:

ELISE M. BLOOM (Keisha-Ann G. Gray, Harris M. Mufson, Bettina Plevan, *on the brief*), Proskauer Rose LLP, New York, NY.

DEBRA ANN LIVINGSTON, *Circuit Judge*:

On February 28, 2018, following a six-week trial, a jury returned a verdict in favor of Plaintiff-Appellant-Cross-Appellee Dr. Effat S. Emamian ("Emamian"), and against her former employer, Rockefeller University ("Rockefeller"), awarding Emamian $250,000 in back pay and $2,000,000 in emotional distress damages on her claim of intentional discrimination on the basis of race or national origin under the New York City Human Rights Law ("NYCHRL"). After the district court ordered a retrial on emotional distress damages unless a remittitur was accepted, Emamian stipulated to remittitur to obtain a final judgment. Both parties thereafter appealed that final judgment of $250,000 in back pay and

2

$200,000 in remitted emotional distress damages, challenging various aspects of the district court's pre- and post-trial rulings. Emamian contends, *inter alia*, that the district court erred by failing to instruct the jury as to punitive damages. Rockefeller, for its part, argues that judgment in its favor or a new trial is warranted because of prejudicial defects in the jury instructions and verdict form and due to circumstances surrounding the announcement of the verdict—namely, the district court's decision, after an error on the initial verdict form had been brought to its attention, to recall the previously discharged jury and permit continued deliberations.[2] For the reasons set forth below, we find no merit in the challenges to the district court's rulings asserted by either party and therefore AFFIRM the judgment of the district court.

## BACKGROUND

### I

Emamian, an Iranian-born neuroscientist who wears a traditional Iranian headscarf, immigrated to the United States in 1998 to pursue career opportunities

---

[2] A summary order issued simultaneously with this opinion addresses the parties' remaining arguments, which concern the district court's rulings on remittitur, reopening of discovery, the scope of expert testimony, sanctions for failure to comply with discovery obligations, and sufficiency of the evidence.

as a research scientist.   She began working at Rockefeller in 2001 as a postdoctoral fellow and was promoted to the position of Research Associate in 2003.   In 2004, Dr. Paul Greengard ("Greengard") invited Emamian to join his lab as a Research Assistant Professor.   Greengard helped Emamian retain a grant to support her prior research and, at Emamian's request, wrote a letter to Immigration and Naturalization Services in support of her application for permanent residency. Subsequently, on August 1, 2004, Emamian began a three-year appointment as a Research Assistant Professor in Greengard's lab.

Emamian testified at trial that she began to feel singled out and mistreated due to her race, national origin, gender, and religion almost immediately upon joining the lab.   According to Emamian, soon after she joined the lab, Greengard made her feel uncomfortable by asking her numerous questions about her headscarf with a "sarcastic" and "negative" attitude, despite her attempts to change the subject.   Joint App'x 943–44.   Emamian said the conversation went on for approximately twenty minutes and made her feel "kind of desperate, very, very uncomfortable," though she did not feel he was discriminating against her at the time.   *Id.* at 944–45.   Greengard testified that he had been told by his secretary, who was also Iranian, that wearing a headscarf is a sign of submission

4

to men among Iranian women and that it was rare for an educated Iranian woman to wear one.

According to Emamian, other non-Middle Eastern employees in Greengard's lab during this time were treated better than she was. Emamian testified that, unlike other employees, she did not receive an office or a computer; she was ridiculed and humiliated in front of others in the lab, including by being aggressively questioned and belittled during a lab presentation in May 2005; and she received little support from Greengard with regard to research, writing, or obtaining another position. Emamian further testified that she felt excluded from life in the lab. One specific incident described to the jury involved an email sent to the entire lab by another researcher, Dr. Marc Flajolet ("Flajolet"). The email had the subject line "to the 'cart drivers' (and camel drivers . . . and horse drivers too . . .)" and included a photo of a camel as an attachment, alongside numerous other photos. *Id.* at 4196–4211. Emamian testified that the email was sent shortly after Flajolet saw her pushing a cart through the lab and mocked her, and that she felt humiliated by the email because she understood "camel driver" to be a widely-recognized racial slur against Middle Easterners commonly used in France, where Flajolet was from. Dr. Ali Brivanlou, another Iranian scientist at

5

Rockefeller who had lived in France, testified that he had not heard of such a slur. When asked at his deposition whether he did anything about the email, Greengard did not specifically remember receiving the email but, upon reviewing it, stated that it "had nothing objectionable in it." *Id.* at 2163–64.

Greengard, by contrast, maintained that he began to develop a negative opinion of the quality of Emamian's work, her ability to take feedback, and her "understanding of simple, logical issues" in the fall of 2004. *Id.* at 2153. He had directed her to stop doing research on human post-mortem tissues because it was inappropriate for the type of experiments she was conducting, and Greengard believed Emamian was dissatisfied with that directive. Greengard came to conclude that hiring Emamian was "perhaps the biggest mistake [he'd] ever made in [his] professional career." *Id.* at 2152.

Ultimately, Greengard informed Emamian that she should make every effort to find a new position as soon as possible, and that he would be willing to write her a recommendation only for a small teaching school, as opposed to a research institution. Emamian spent the rest of her time in the lab attempting to finish her research and searching for another position. Beginning in July 2005, she began efforts to reach out to Rockefeller's President, Dr. Paul Nurse, regarding

her experience with Greengard. After significant delays, she ultimately met with Virginia Huffman, the head of Human Resources, to complain of perceived discrimination and mental abuse by Greengard. An internal investigation concluded that Greengard was not motivated by discrimination.

Throughout this period, Emamian began experiencing intensifying mental health issues. She commenced mental health treatment in September 2005 and was ultimately diagnosed with generalized anxiety disorder and trichotillomania, or compulsive hair pulling. Emamian testified that pulling her hair was the only way she could get relief from her extreme stress and that she continues to suffer from this condition. She also developed insomnia and was prescribed sleeping pills, to which she became severely addicted and which caused her to gain nearly forty pounds. As a result of her mental health struggles, she became socially isolated and rarely left the house. Emamian's psychiatric expert testified that prior to her experience at Rockefeller, she had no psychiatric problems of any kind.

On July 31, 2007, Emamian's three-year appointment at Rockefeller expired, and she was denied reappointment. Since the end of her time at Rockefeller, Emamian has not found other employment despite applying to positions

7

throughout the United States and Canada.   She attributes this circumstance to Greengard's refusal to help her secure a new position.

## II

Emamian filed suit on May 18, 2007, alleging, among other things, discrimination and retaliation based on race, national origin, religion, and sex under Title VII, the New York State Human Rights Law, and the NYCHRL.   On June 15, 2009, following dismissal of several of her claims, Emamian amended her complaint to add negligence and promissory estoppel claims stemming from Rockefeller's alleged failure to preserve certain mouse lines she used in her research.

On July 29, 2010, the parties submitted their proposed jury instructions which, in Emamian's case, included a request for a punitive damages instruction. As of August 31, 2010, the case was trial-ready.   However, two separate withdrawals of Emamian's counsel in 2011 and in 2016 delayed further proceedings.   Emamian's present counsel filed notices of appearance in July 2016.

Trial began on January 17, 2018.[3]   On February 14, Emamian rested her case.   The following day, Rockefeller moved for judgment as a matter of law on

---

[3] As to Emamian's discrimination and retaliation claims, the parties stipulated

8

all claims. On February 21, the district court issued an opinion granting judgment as a matter of law as to Emamian's negligence claim but denying the motion as to all other claims. Upon the court's request, the parties then submitted additional briefing regarding Emamian's possible entitlement to certain types of damages, including punitive damages. On February 23, 2018, the court held a charge conference to discuss its proposed jury instructions (which did not include a punitive damages instruction) and the verdict form. Emamian's counsel did not raise the issue of punitive damages during the charge conference nor did counsel object after the charge was read to the jury.

**III**

Following six weeks of trial, the jury began deliberations on February 26, 2018. After two days of deliberation, the jury asked for clarification of the first question on the verdict form focusing, in particular, on that portion of the question that asked whether the jury found that the plaintiff had shown she had been treated less well, at least in part, because of her race or national origin, gender, or religion. In response to this query, the court reread the charge on intentional

---

during trial that only the NYCHRL claims would go forward, permitting the district court to streamline the jury charge and deliberations by instructing the jury solely as to the NYCHRL standard. Dist. Ct. Dkt. No. 167 at 2; *see also* Dist. Ct. Dkt. Nos. 168-69.

9

discrimination.   Later that day, the jury informed the district court that it had reached a verdict.

The verdict form was provided to the courtroom deputy.   On the form as filled out by the jury, the first question ("Question One"), which includes two subparts, reads as follows, with the letter "x" denoting the jury's handwritten checkmarks:

1. Which of the protected statuses, if any, do you find unanimously that the Plaintiff proved by a preponderance of the evidence:

    The University treated her less well, in [sic] least in part, because of her:
    _x_ race/national origin
    ___gender
    ___religion

    Did the Plaintiff prove by a preponderance of the evidence that the Defendant intentionally discriminated against her at least in part because of her race/national origin, and/or gender, and/or religion?
    Yes _____ No ___x_____

Supp. App'x 59–60.   Elsewhere on the verdict form, the jury rejected Emamian's retaliation and promissory estoppel claims; left blank a section for awarding nominal damages; indicated compensatory damages of $250,000 in back pay and

10

$2,000,000 in "Physical and/or Mental and/or Emotional Damages"; and left blank a section for promissory estoppel damages.  *Id.* at 61–64.

With the jury in the courtroom, the courtroom deputy read aloud the questions on the verdict form relevant to liability (including the second subpart of Question One) and the foreperson pronounced the jury's answers as reflected on the verdict form.   The award of damages was not referenced at all.   The court then polled the jurors, asking each individually, "Was that your verdict?"   Joint App'x 4136–37.   After each juror answered in the affirmative, the district court announced that the jury was discharged.   Immediately thereafter, however, Emamian's counsel asked to approach the bench and the court asked the jurors to remain in the courtroom.   As Emamian's counsel alerted the court at sidebar to what counsel viewed as a potential inconsistency in the verdict, the courtroom deputy stated, in open court:   "Judge, they made a mistake."   Joint App'x 4137.   In response, the court asked the jurors if they needed to "go back into the jury room and straighten something out" and whether they needed "another verdict form"; upon receiving affirmative responses to both questions, the court permitted the jury to reconvene, return to the deliberation room, and complete a new form.

*Id.* at 4138. Prior to bringing the jury back into the courtroom, the court explained on the record what had transpired:

> [A]fter the verdict was read, and I discharged them, they called [the deputy] over, and said you didn't read some of what we said. What they said was they had filled in dollar numbers, even though they had said no to everything except . . . race and national origin. So, they realized the mistake, they asked for another form, we gave them another form, they filled out another form, and now we're going to have act two of the verdict.

*Id.*[4]

The jury returned to the courtroom fifteen minutes after beginning their continued deliberations. Prior to the announcement of the corrected verdict, the court stated to the jury: "I understand that there was an error made by you in filling out the first verdict form. You caught it. You asked to have an opportunity to correct it. You were given that opportunity." *Id.* at 4138–39. The court also observed that, "[b]y the way, I think I'd actually discharged you

---

[4] The district court later made clear on the record that it was the jury foreperson who "realized that there was something amiss" when no dollar amounts were read in connection with the pronouncement of the verdict and who raised the matter with the courtroom deputy. Joint App'x 4143.

before this mistake was known. You're no longer discharged. You are still jurors." *Id.* at 4139.

The verdict form was again read by the courtroom deputy and the jury was polled for a second time. The second verdict form was identical in all respects to the initial form, except that it indicated an answer of "yes" to the second part of Question One. The time denoted on the new verdict sheet showed that the jurors had completed the verdict form within three minutes of returning to the deliberation room. The jury again awarded $250,000 in back pay damages and $2,000,000 in emotional distress damages. After being polled, the jury was discharged.

A month later, Rockefeller renewed its motion for judgment as a matter of law and moved, in the alternative, for a new trial. On June 8, 2018, the district court denied the renewed motion for judgment as a matter of law and the bulk of Rockefeller's motion for a new trial, but ordered a retrial on emotional distress damages unless Emamian accepted a remitted award of $200,000. On December 11, 2018, the court issued an order accepting a stipulation by the parties that the outcome of a retrial would have been $200,000 in emotional distress damages, permitting the entry of final judgment in order to secure appellate review. The

13

next day, the court entered final judgment of $250,000 in back pay and $200,000 in emotional distress damages. Emamian timely filed a notice of appeal on January 11, 2019, and Rockefeller filed a notice of cross-appeal on January 16, 2019.

## DISCUSSION

The parties raise several arguments alleging improprieties in the jury instructions, the verdict form, and the court's decision to allow the jury to reassemble and to complete a new verdict form.

## I

Emamian asserts that the district court erred by failing to instruct the jury on punitive damages. At the start, we conclude that Emamian failed to preserve her objection to the district court's decision not to include a punitive damages charge. We therefore review this claim solely for plain error and conclude, further, that Emamian has failed to establish such error here.

Under Federal Rule of Civil Procedure 51(c)(1), a party "who objects to an instruction or the failure to give an instruction must do so on the record, stating distinctly the matter objected to and the grounds for the objection." Accordingly, we have held that a party may not "rely on her submission of proposed jury instructions that included a[] [requested] instruction" to preserve an objection.

14

*Caruso v. Forslund*, 47 F.3d 27, 31 (2d Cir. 1995). This Court may excuse a failure to object "where the party's position has previously been made clear to the trial court and it was apparent that further efforts to object would be unavailing." *Anderson v. Branen*, 17 F.3d 552, 556–57 (2d Cir. 1994). But absent such circumstances, an objection must be lodged so as to afford the trial court "an adequate opportunity to cure any defects in the instruction before sending the jury to deliberate." *Caruso*, 47 F.3d at 31.

Here, Emamian failed to properly object to the district court's decision to exclude the punitive damages instruction, and the record demonstrates that further objection would not have been futile. To be sure, in addition to including a punitive damages instruction in her proposed jury instructions, Emamian also set forth arguments in support of a punitive damages instruction in her February 21, 2018 submission in response to the court's request for additional briefing regarding damages. Critically, however, Emamian's counsel never raised the issue during the charge conference, though counsel meticulously combed through the entire charge and fully aired numerous other objections. Nor did Emamian's counsel object after the charge was read.

15

Accordingly, this case is distinct from both *Thornley v. Penton Publishing, Inc.*, 104 F.3d 26 (2d Cir. 1997), and *Rose v. New York City Board of Education*, 257 F.3d 156 (2d Cir. 2001), upon which Emamian relies. In each of those cases, the party objected multiple times, including at the charge conference, and the district court, in response, issued explicit rulings in favor of the opposing party; the only deficit was the failure to renew the parties' objections after the jury had been charged. *See Rose*, 257 F.3d at 160; *Thornley*, 104 F.3d at 30. In those circumstances, the Court reasonably excused the failure to make an additional objection on the basis that further attempts to convince the district court to change its position would have been futile.

Here, by contrast, the district court never took a firm position as to punitive damages; rather, the court expressed only tentative views on the question in the course of requesting briefing from the parties. *See* Joint App'x 3612 (stating that "*based on what I know now*, I don't even think that punitive damages is going to be an issue. I have much more difficulty knowing nominal damages or compensatory damages" (emphasis added)). While the court, in subsequently drafting the jury charge, did not include a charge on punitive damages after reading the parties' briefing and their proposed instructions, the court was entitled

16

to rely on the fact that, to the extent its formulation of the jury charge contained any errors or omissions, the parties would set forth those objections and fully litigate them at the charge conference—a proceeding explicitly designed for that purpose. Accordingly, it would have been far from futile for Emamian to raise and fully litigate the issue at the charge conference or to raise an objection before the jury retired to deliberate. Emamian's objection to the lack of punitive damages instruction was therefore waived, limiting this Court to plain error review.

Emamian has not established such error here. This Court has "long noted that the plain error exception to Rule 51's objection requirement 'should only be invoked with extreme caution in the civil context.'" *Rasanen v. Doe*, 723 F.3d 325, 333 (2d Cir. 2013) (quoting *Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 18 (2d Cir. 1996)). To constitute plain error in these circumstances, a court's action must affect substantial rights, "contravene an established rule of law," and "go to the very essence of the case." *Id.* (alteration and citations omitted).

Emamian has not satisfied this demanding standard. Emamian correctly points out that, pursuant to the decision of the New York Court of Appeals in *Chauca v. Abraham*, punitive damages under the NYCHRL may be awarded in

17

appropriate circumstances. 30 N.Y.3d 325, 329 (2017) (holding that punitive damages are based on a showing of "willful or wanton negligence, or recklessness, or where there is a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard" (internal quotation marks omitted)). The evidence to which she points to establish such circumstances here, however— principally proof of the magnitude of her emotional distress, Rockefeller's alleged failure to appropriately respond to her discrimination claim, and Greengard's criticism of her work—constitutes but a paltry basis for the imposition of punitive damages, much less the sort of showing necessary to establish that an instruction on punitive damages "go[es] to the very essence" of this case. *Rasanen*, 723 F.3d at 333. The severity of Emamian's emotional distress was accounted for by the jury's compensatory damages award and is not a valid basis for punitive damages. *See Chauca*, 30 N.Y.3d at 331. Moreover, Emamian failed to adduce any substantial evidence that Greengard's criticisms of her work were detached from valid scientific objections, or that Rockefeller's response to her complaint was insufficient, particularly in light of the jury's rejection of her retaliation claim.

At bottom, any evidence in the trial record that could even arguably justify punitive damages is sparse, and the failure to instruct the jury on such damages

accordingly did not cut to the core of Emamian's case. In these circumstances, Emamian cannot demonstrate that the failure to instruct the jury on punitive damages constituted an error "so serious and flagrant that it goes to the very integrity of the trial." *Pescatore*, 97 F.3d at 18 (internal quotation marks omitted).

## II

We next turn to the arguments raised by Rockefeller in its cross-appeal. First, Rockefeller argues that prejudicial errors in the jury instructions and verdict form require a new trial. For the following reasons, we disagree.

As to the jury instructions, Rockefeller maintains that the district court erred by supposedly failing to instruct that "a plaintiff alleging intentional discrimination under the NYCHRL must establish that 'unlawful discrimination was one of the motivating factors, even if it was not the sole motivating factor, for an adverse employment decision,'" Br. of Appellee-Cross-Appellant at 35 (quoting *Melman v. Montefiore Med. Ctr.*, 98 A.D.3d 107, 127 (1st Dep't 2012)), and instead "direct[ing] the jury to impose liability" if Emamian established that she was treated less well than others at least partly because of her race and national origin — a formulation of the standard, according to Rockefeller, that "eliminate[s]

19

the element of intent necessary to a finding of liability," *id.* [5]  We review

Rockefeller's properly preserved claim of legal error in the jury instructions *de novo*, bearing in mind that "a trial court has discretion in the style and wording of jury instructions."  *Parker v. Sony Pictures Ent., Inc.*, 260 F.3d 100, 106 (2d Cir. 2001).  Jury instructions "are erroneous if they mislead the jury or do not adequately inform the jury of the law," but we "will set aside a judgment secured by an erroneous charge only if the appellant shows that the error was prejudicial in light of the charge as a whole."  *Uzoukwu v. City of New York*, 805 F.3d 409, 414 (2d Cir. 2015).

Reviewing the instructions as a whole, we conclude that the requirement of intentional discrimination was clearly expressed, and therefore reject Rockefeller's claim.  "It is axiomatic . . . that a jury charge should be examined in its entirety, not scrutinized strand-by-strand."  *Id.*  In its instructions, the court read directly from the text of the NYCHRL as set forth in the New York City Administrative Code Section 8-107, then extensively explained the legal standard, relying nearly verbatim on the language set forth in *Mihalik v. Credit Agricole Cheuvreux North*

---

[5] We note that Emamian proceeded under § 8-107(1)(a) of the NYCHRL, pursuant to a theory of intentional discrimination, and not under the NYCHRL's separate provision applying to disparate impact claims.

20

*America, Inc.*, 715 F.3d 102, 110 (2d Cir. 2013).   Moreover, the court specifically

instructed that:

> In order to find the defendant liable for discrimination based on race, or gender, or national origin, or religion, you must find that the reasons for the action taken by the defendant included the unlawful discrimination. . . .
> The plaintiff still bears the burden of showing that the defendant's conduct, viewed from the point of view of a reasonable employee, includes a *discriminatory motive*.   It is not enough that a plaintiff has an overbearing or obnoxious boss.   To the extent plaintiff emphasizes that she subjectively felt humiliated, degraded, and isolated by the perceived slights of the defendant, mere personality conflicts must not be mistaken for unlawful discrimination.   She must show that she has been treated less well at least in part because of her gender, or her race, or her national origin, or her religion.

Joint App'x 4075–76 (emphasis added).   The court thus explicitly instructed the

jury on the element of intent that Rockefeller insists was missing from the jury

charge.   *See Mihalik*, 715 F.3d at 110 ("The plaintiff still bears the burden of

showing that the conduct is caused by a discriminatory motive. . . . She must show

that she has been treated less well at least in part because of her [protected class]."

(internal quotation marks and emphasis omitted)).   Accordingly, Rockefeller is

not entitled to a new trial based on any error in the jury instructions.

We likewise perceive no prejudicial error in the verdict form.   Rockefeller

insists that Question One of the form framed the issues in a way that suggested a

verdict in favor of Emamian because there was no option to select "none" or "not

21

applicable" from the list of protected classes. Rockefeller further contends that the order of the questions was prejudicial because, as structured, the form forced the jury to conclude that Rockefeller treated Emamian less well based on a protected characteristic before any finding of discriminatory intent.

"The formulation of special verdict questions rests in the discretion of the trial judge, and therefore our review is confined to inquiring whether the trial court's submission of the issues in the form of these questions constituted an abuse of discretion." *Cann v. Ford Motor Co.*, 658 F.2d 54, 58 (2d Cir. 1981) (citations omitted). As we have repeatedly said, "[w]e will reverse a judgment entered upon answers to questions which mislead and confuse the jury or which inaccurately frame the issues to be resolved by the jury." *Id.*

While the verdict form here was not a model of clarity, Rockefeller has not established that the court abused its discretion in crafting the special verdict questions. First, we conclude that Rockefeller waived any objection to the lack of a "none" or "not applicable" option in the first part of Question One. *See Jarvis v. Ford Motor Co.*, 283 F.3d 33, 57 (2d Cir. 2002) (applying the Rule 51 standard to the preservation of an objection to a special verdict form). Rockefeller maintains that its failure to object with specificity was justified because the court agreed at the

charge conference to reverse the order of the question's two subparts, rendering the inclusion of a "none" or "not applicable" option unnecessary. Yet Rockefeller failed to raise its objection after it became clear that the court did not in fact reverse the order of the questions. Had Rockefeller objected with specificity to the absence of a "none" or "not applicable" option at that point, rather than referring generically to the previously-determined issue of the ordering of the questions, the court would have had the opportunity to consider fully the merits of Rockefeller's position and could have easily implemented the change if it determined, in its discretion, that Rockefeller's formulation was preferable.

Regardless, even assuming that Rockefeller adequately preserved the objection, it is without merit. The lack of a "none" or "not applicable" option could not have prejudiced the jury in light of the question's inclusion of the words "which of the protected statuses, *if any*, do you find . . . ." Supp. App'x 59 (emphasis added). By insisting that the "if any" language was not sufficient because the jury had no way of marking that selection on the form, Rockefeller ignores the fact that the jury could have simply left the selection blank. Indeed, the completed verdict form demonstrates that the jury was well aware of the option for leaving a selection blank when it was not applicable, as demonstrated

23

by the empty responses with respect to nominal damages and promissory estoppel damages. This is especially clear with respect to damages stemming from Emamian's promissory estoppel claim, where the verdict form directed the jury to "state the total amount, *if any*, of damages," *id.* at 71 (emphasis added), and the jury left the space blank, clearly demonstrating its awareness of how to indicate a "none" or "not applicable" selection where "if any" language was used.

Rockefeller's argument as to the ordering of the two parts of Question One fares no better. Because, as discussed above, the jury could have left Part One of the question blank in accordance with the "if any" language, there was no prejudice to Rockefeller due to the ordering of the questions. Accordingly, Rockefeller has not demonstrated any prejudicial error in the formulation of the verdict form necessitating a new trial.

### III

Finally, Rockefeller contends that the district court erred by rescinding its discharge order, recalling the jury, and permitting the jury to continue deliberating and to complete a new verdict form. Rockefeller first argues that the district court lacked the power to recall its discharge order because "this power is reserved for circumstances where the verdict form contains an error or inconsistency,"

24

which Rockefeller argues is not the case here. Br. of Appellee-Cross-Appellant at 20. Rockefeller next maintains that even if the district court had such inherent power, the court abused its discretion by recalling the jury after jurors had supposedly been exposed to prejudicial outside influences. Rockefeller also suggests that the corrected verdict is invalid because the court failed to timely re-empanel the jurors.

We review Rockefeller's legal argument that the district court lacked the inherent power to recall the jury *de novo*, and its argument that the exercise of the power was inappropriate under the circumstances for abuse of discretion. *See Dietz v. Bouldin*, 136 S. Ct. 1885, 1895 (2016); *United States v. Rojas*, 617 F.3d 669, 677 (2d Cir. 2010). We conclude that the district court had the power to rescind its discharge order and that, in the circumstances of this case, its decision to do so was a proper exercise of discretion.

A

In *Dietz v. Bouldin*, the Supreme Court held that district courts have "a limited inherent power to rescind a discharge order and recall a jury in a civil case where the court discovers an error in the jury's verdict." 136 S. Ct. at 1892. In recognizing this power, the Court forcefully rejected what it deemed the

25

"'Humpty Dumpty' theory of the jury," under which "something about the jury is irrevocably broken once the jurors are told they are free to go," such that they "cannot be brought back together again as a 'jury.'" *Id.* at 1896. Instead, the Court adopted a practical view of the district court's authority in this realm, locating the power to rescind a discharge order and recall a jury within the long-recognized control necessarily exercised by courts to "manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Id.* at 1891 (quoting *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630–31 (1962)).

Rockefeller asserts that the power to rescind a discharge order and recall the jury was unavailable to the district court in this case. According to Rockefeller, courts may invoke this power only where the initial verdict form "contains an error or inconsistency." Br. of Appellee-Cross-Appellant at 20. Citing cases in which this Court has upheld jury verdicts on the basis that the jury's responses on a special verdict form could be reconciled, *see, e.g.*, *Aczel v. Labonia*, 584 F.3d 52, 57–58 (2d Cir. 2009), Rockefeller insists that the jury's initial responses to the two subparts of Question One here were not inconsistent. But Rockefeller simply ignores the fact that the jurors in this case directly apprised the district court of a mistake in the verdict in the immediate aftermath of its pronouncement,

26

contending, instead, that only errors evident on the face of a verdict form, rather than those brought to the court's attention by some other means, permit the rescission of a discharge order.

Yet *Dietz* contains no such limitation. The Supreme Court in *Dietz* recognized the carefully delineated power of a district court to rescind a discharge order after "identifying," "discover[ing]," or "recogniz[ing]" an error in a verdict. 136 S. Ct. at 1890, 1892. This language readily encompasses not only circumstances in which a jury fills out a verdict form reflecting a verdict that is legally impossible on its face, but also certain other kinds of mistakes, such as errors in the pronouncement or transmission of the verdict, which could be brought to the court's attention by the jury itself. *See Attridge v. Cencorp Div. of Dover Techs. Int'l, Inc.*, 836 F.2d 113, 116–17 (2d Cir. 1987) (describing "transmission" errors, wherein the verdict form fails to "reflect the verdict 'actually' reached" by the jury).

Here, the court "discover[ed]" an error in the verdict when the jury, immediately after pronouncement of the verdict, brought that error to the court's attention. *Dietz*, 136 S. Ct. at 1892; *see* Joint App'x at 4138 (explaining to counsel that the jury "realized the mistake, [and] asked for another form"); *id.*

27

(acknowledging to the jury that "there was an error made by you in filling out the first verdict form. You caught it"). Rockefeller's focus on cases relating to inconsistent verdicts is therefore misplaced: even assuming *arguendo* that there was a path to reconciling the jury's responses on the first verdict form, it was nevertheless within the district court's authority to rescind its discharge order and allow the jury to address a mistake that the jury itself raised directly after the verdict was pronounced. The exercise of this inherent power is subject, of course, to the prudential considerations discussed below. But just as in *Dietz*, such an inherent power is "a reasonable response to a specific problem," not in contradiction of "any express rule or statute," 136 S. Ct. at 1892, permitting the district court to "manage . . . [its] own affairs so as to achieve the orderly and expeditious disposition of cases," *id.* at 1891 (quoting *Link*, 370 U.S. at 630–31).

We thus decline Rockefeller's invitation to cabin the power recognized by the Supreme Court in *Dietz* solely to cases in which the initial verdict as expressed on a verdict form is inconsistent or otherwise legally impermissible. Like the *Dietz* Court, we do not attempt a full delineation of the circumstances in which a court may properly rescind a discharge order. We hold only that this inherent

28

power extends to a case like this, where the jury itself *sua sponte* advises the district court of a mistake in the verdict immediately after that verdict is rendered.

Of course, even in this context, the inherent power to rescind a discharge order is not unlimited:   to the contrary, the *Dietz* Court emphasized that it must be exercised "with restraint" due to the "risk [of] undermining other vital interests related to the fair administration of justice."   *Id.* at 1893.   Accordingly, we next address whether the district court properly exercised its discretion in the circumstances of this case.

B

A district court's power to rescind a discharge order and recall a jury for further deliberation must be "carefully circumscribed" to ensure the absence of external influences that could taint the jury's determination.   *Id.* at 1893.   To that end, the *Dietz* Court directed courts to guard against "[a]ny suggestion of prejudice" by considering the following factors:   (1) "the length of delay between discharge and recall"; (2) "whether the jurors have spoken to anyone about the case after discharge," including court staff; (3) "the reaction to the verdict," including whether jurors witnessed "[s]hock, gasps, crying, cheers, and yelling";

and (4) "other relevant factors," including "to what extent just-dismissed jurors accessed their smartphones or the internet."  *Id.* at 1894–95.

Weighing each of these factors, as well as additional prudential concerns relevant where the mistake in question is one that is identified by the jury itself, we conclude that the district court acted well within its discretion in rescinding its discharge order and permitting the jury to complete a second verdict form.  First, there was essentially no delay between discharge and recall; indeed, the jurors had not yet left the courtroom, minimizing any potential exposure to external influences.  The risk of prejudice here was therefore significantly less than that found permissible in *Dietz*, where "the jury was out for . . . a few minutes" and "one juror may have left the courthouse."  *Id.* at 1895.[6]

As for whether jurors had spoken to anyone who could have tainted their judgment, we likewise perceive no cause for concern.  Rockefeller makes much of the remark made by the courtroom deputy in the course of explaining the situation to the court after being approached by the jury foreperson.  *See* Joint

---

[6] Notably, the district court's decision to recall the jury in the present case would have passed muster even under the more restrictive rule advanced by the losing party in *Dietz*, who advocated for "the adoption of a functional discharge test based on whether the jurors remain within the presence and control of the district court, where control is limited to the courtroom itself."  136 S. Ct. at 1896 (internal quotation marks omitted).

30

App'x 4137 ("Judge, they made a mistake").   However, this statement differs

from the hypothetical prejudicial remark by a courtroom deputy posited in *Dietz*.

*See* 136 S. Ct. at 1894 (observing that "[e]ven apparently innocuous comments

about the case from someone like a courtroom deputy such as 'job well done' may

be sufficient to taint a discharged juror").   Rather than making a potentially

prejudicial assessment of the quality of the jury's work, as in *Dietz*, the courtroom

deputy's comment here simply relayed to the judge the circumstances which the

jury foreperson brought to the attention of the deputy.   In context, the courtroom

deputy's remark does not suggest the possibility of prejudice.

Furthermore, there is no indication in the record that the discharged jurors

witnessed a reaction to their verdict that could have influenced their judgment.

While Rockefeller repeatedly refers to the fact that the jury was able to observe

Emamian's response, nothing in the record reflects that Emamian or anyone else

in the courtroom exhibited an "emotional reaction[]" that could have "cause[d]

jurors to begin to reconsider their decision."   *Id.*   Inevitably, *any* scenario

implicating *Dietz* involves a jury reconvening after having observed the reaction

to its verdict, and Rockefeller's failure to point to any specific indication in the

record of any pronounced reaction in this case undermines the suggestion of

31

prejudice.   There is likewise no indication that jurors, who had been dismissed just moments prior and remained at all times within the courtroom, accessed smartphones or other technology that could have had a prejudicial influence.   In these circumstances, the district court correctly determined that the possibility of jury taint was minimal.

Finally, we note that an additional prudential consideration is relevant where the error in question is one identified by the jury itself.   Namely, where the only indication of anything awry with the verdict is the jury's own identification of an error, district courts should guard against the possibility of juries seeking to revise their otherwise-valid factual findings based on a desire to achieve a specific legal outcome.   *See Munafo v. Metro. Transp. Auth.*, 381 F.3d 99, 107 (2d Cir. 2004) (holding that the district court did not abuse its discretion in accepting a jury's initial verdict where the court reasonably concluded that the verdict form accurately captured the intended verdict, and that the jurors had simply misjudged the legal effect of their responses).[7]

---

[7] Rockefeller suggests that the short turnaround time before the jury returned with its corrected verdict form is indicative of such impermissible revision for the sole purpose of awarding damages to Emamian.   To the contrary, the brevity of the redeliberation period suggests an easily remedied transmission error on the initial form rather than a concerted effort to revise the verdict to achieve a particular legal outcome.

We have no such concern here, however. As an initial matter, the district court is best positioned to determine whether a jury should be denied the opportunity to correct a mistake on this basis, and we defer to the court's determination that no impermissible revision of the verdict was at work here. *See* Joint App'x 4143 ("[T]he fact that they found against the plaintiff for retaliation and also for promissory estoppel suggests that they really did go through the evidence and make independent judgments."). Furthermore, the jury's identification of a mistake did not stand alone in suggesting that the verdict required resubmission for clarification. The jurors had already indicated some confusion about Question One, requiring the court to reread its instruction on intentional discrimination. And even though the framing of this question was not *so* confusing as to constitute an abuse of discretion, the responses on the initial verdict form evinced obvious tension with one another, which the district court was in the course of discussing with counsel immediately following its discharge order. Against this backdrop, when the jurors themselves identified an error and sought an opportunity to correct it, it was eminently reasonable for the district court to determine that the verdict form reflected a transcription error or a transmission problem caused by "confusion or uncertainty" warranting

33

resubmission for further clarification, and that the discharge order had therefore issued in error. *Kerman v. City of New York*, 261 F.3d 229, 244 (2d Cir. 2001) (quoting *Richard v. Firestone Tire & Rubber Co.*, 853 F.2d 1258, 1260 (5th Cir. 1988)); *see Dietz*, 136 S. Ct. at 1896 ("[L]ike any order, [a discharge order] can be issued by mistake."). Moreover, because, as discussed above, every *Dietz* factor weighed in favor of the permissibility of recalling the jury, the district court properly took the opportunity to rescind its erroneous discharge order, thereby "restor[ing] the legal status quo before the court dismissed the jury." *Dietz*, 136 S. Ct. at 1892.

Prior to discharge, we defer to the district court's determination that a verdict requires resubmission for clarification, as "the district judge . . . is in the best position to determine whether the answers reflect confusion or uncertainty." *Kerman*, 261 F.3d at 244 (quoting *Richard*, 853 F.2d at 1260). In the post-discharge circumstances here, we similarly conclude that the district court did not abuse its discretion in exercising its power to rescind the discharge order and recall the jury for further deliberation, thus "manag[ing] [its] own affairs so as to achieve the orderly and expeditious disposition of cases." *Dietz*, 136 S. Ct. at 1891 (quoting *Link*, 370 U.S. at 630–31).

C

Rockefeller's final argument is that the second verdict form was invalid due to the timing of the district court's re-empanelment of the jury. Specifically, Rockefeller asserts that "the individuals who deliberated and completed the second verdict form were not in fact an empaneled jury" because the district court did not explicitly state that the jury was no longer discharged until after the jurors had already returned with the completed second verdict form. Br. of Appellee-Cross-Appellant at 26.

We find no merit in this contention. To be sure, the district court in *Dietz* first officially re-empaneled the jury before permitting jurors to continue deliberating. *See* 136 S. Ct. at 1891. However, Rockefeller's position is flatly contradicted by the Supreme Court's language in *Dietz*, which recognized that "there is nothing about the jury as an entity that ceases to exist simply because the judge tells the jury that they are excused from further service. A discharge order is not a magical invocation." 136 S. Ct. at 1896. In accordance with this reasoning, the Court staunchly rejected Dietz's argument that an empaneled jury has some kind of metaphysical bond that renders it distinct from a discharged jury. *See id.* In a pre-*Dietz* case, this Court reached a similar conclusion. *See Rojas*, 617

F.3d at 677 ("The mere incantation of the word 'discharged' marks only a time when the jurors have been discharged nominally.").

Rockefeller's hypertechnical "order of operations" argument thus flies in the face of the practical orientation of both *Dietz* and our pre-*Dietz* case law. Given *Dietz*'s rejection of a "magic-words" approach to jury discharge, 136 S. Ct. at 1896, the district court's instructions to the jurors that they were permitted to redeliberate and complete the second verdict form provided to them at their request, paired with its statement prior to the reading of the second verdict form that "I think I'd actually discharged you before this mistake was known. You're no longer discharged. You are still jurors," Joint App'x 4139, was sufficient to avoid any confusion about the jurors' status. Especially given that Rockefeller "raised no objection to this part of the court's process," *Dietz*, 136 S. Ct. at 1897, the timing of the court's official reconstitution of the jury does not offer a basis for entering judgment in Rockefeller's favor or ordering a new trial.

## CONCLUSION

For the foregoing reasons, as well as those set forth in the accompanying summary order, we AFFIRM the judgment of the district court.